UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| SHIFTPIXY, INC. *et, al.*[1] | Case No. 24-21209-LMI |
| Debtors. _____/ | (Jointly Administered) |

# DECLARATION OF JONATHAN FELDMAN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Jonathan Feldman, make this declaration (the "Declaration") [2] pursuant to 28 U.S.C. § 1746, and state:

1. I am a partner at Phang & Feldman ("PF"), which has a place of business at 2 South Biscayne Boulevard, Suite 1600 Miami, Florida 33131.

2. I execute this Declaration in support of the Chapter 11 Petitions and First Day Pleadings as I have personal knowledge of the matters set forth herein. If called and sworn in as a witness, I could, and would, testify competently to the matters set forth herein.

## A. Background of ShiftPixy, Inc.

3. ShiftPixy, Inc. ("SPI") is Wyoming corporation organized on June 3, 2015. Its principal executive office is located at 4101 NW 25th Street, Miami, FL 33142.

4. SPI has developed a human capital management ("HCM") platform that provides a full suite of staffing services to clients. This includes payroll and related employment tax

---

[1] The Debtors are: (i) Shiftpixy, Inc.; (ii) Shiftpixy Staffing, Inc.; and (iii) ReThink Human Capital Management, Inc. The address of the Debtors is 1401 NW 25th Street, Miami, FL 33142.

processing, human resources and employment compliance, employment related insurance, and employment administrative services solutions.

5. SPI also provides shift work or "gig" opportunities for its clients.

6. In exchange for these services, clients pay SPI an administrative fee which is typically a percentage of the client's payroll and also impacted by the level of services contracted with the client.

7. Technology in large part drives SPI's business model. SPI has developed an application and desktop marketplace solution that allows for workers to access and apply for job opportunities created by SPI's clients and to provide real time information to clients regarding staffing along with traditional back-office services.

8. As of the bankruptcy filing date, SPI provides services to 14 clients with projected annual revenue of about $16.8 million.

9. Until October 28, 2024, SPI was publicly traded on the NASDAQ stock exchange. On that date, NASDAQ delisted SPI from further trading.

**B. Appointment as CRO by the Board of Directors of SPI**

10. Until October 19, 2024, Scott Absher was the Chief Executive Officer of SPI. On that date, the Board of Directors ("Board") of SPI terminated Mr. Absher's employment from the company for cause.

11. The basis of this decision rested on events that occurred two days before. On the morning of October 17, 2024, SPI issued a press release announcing that it had acquired another company called TurboScale for $150 million, structured with $75 million in stock and $75 million in debt.

12. The result of this announcement was a significant spike in SPI's stock price, jumping from the prior day's close of $5.50 to an opening price of $13.11 and an intra-day high of $14.64.

13. However, a subsequent 8-K released by SPI on October 18, 2024 made clear that the definitive state of acquisition of TurboScale was in fact not definitive at all:

> On October 16, 2024, [SPI] entered into a non-binding letter of intent ("LOI") with Turboscale LLC ("Turbo") pursuant to which [SPI] would purchase the assets of Turbo for a purchase price of $150 million, $75 million of which would be payable in shares of common stock of the Company and $75 million of which would be payable in the form of a debt instrument. . . . The completion of the acquisition will be subject to negotiation of definitive agreements and customary closing conditions to be specified therein, and there is no assurance the acquisition will be completed on the terms contemplated in the LOI, or at all.

14. Based on the inconsistencies between the press release and subsequently issued 8-K, along with other certain events that occurred around this time period, the Board conducted a special meeting on October 19, 2024, and terminated Mr. Absher and appointed me as Chief Restructuring Officer of SPI. A copy of the resolution terminating Mr. Absher is attached as **Exhibit 1**.

C. **Actions taken since appointment**

15. On the morning of October 21, 2024, I visited the physical office location of SPI at 4101 NW 25th Street, Miami, Florida.

16. With me on this initial site visit, were employees at Lawgical Insights, LLC ("Lawgical"), a Miami based consulting firm specializing in digital forensics and Barry S. Turner, legal counsel I retained to assist me in my review of SPI and the viability of the business.

17. Upon arrival, Lawgical was tasked with performing an on-site analysis of SPI's corporate IT infrastructure and data preservation policies. Lawgical was also introduced to Ivan Suarez, lead IT Manager for SPI. With Mr. Suarez's assistance, Lawgical was able to identify

critical office resources, block access to potentially harmful personnel, and gain access to SPI's Microsoft Office 365 environment and ensure preservation policies were in-place.

18. I separately met with several employees, including the comptroller, to understand the immediate cash position of the company, number of bank accounts and banking institutions, and upcoming payables and the priority of such payments. I also took certain actions to remove Mr. Absher and his wife from accessing company files and bank accounts.

19. Thereafter, I spent the next several days gathering information about the core business of SPI, its profitability, relationship with creditors and significant financial hurdles facing the company both immediately and more long term. Each of these items is addressed below.

20. ***The business of SPI and its profitability***. As mentioned at the outset, SPI's core business is its HCM platform. Along with the two other debtors, SPI has 14 clients with current projected annual revenues of about $16.8 million. At the gross profit level, the company appears to be operating profitably.

21. However, once overhead and other expenses are factored in, the business routinely runs at a meaningful deficit. For example, in 2023, SPI reported an operating loss of nearly $34 million. Currently, SPI still incurs meaningful operating losses on a monthly basis. The drivers of these expenses are addressed further below.

22. ***Solvency***. Per its public filings, SPI is deeply insolvent on a balance sheet basis. For example, per its most recent 10-K, the stockholder deficit was reported to be over $51 million.

23. Based on a review of current monthly operating results, vendor data and other information provided to me, the company is also not paying its debts as they generally come due. This is addressed in further detail below.

24. ***Creditor obligations – taxing authorities***. This is the most significant issue facing the company. As set forth in SPI's 2023 10-K:

> As of August 31, 2023, [SPI] is delinquent with respect to remitting payroll tax payments to the IRS, states, and local jurisdictions. . . . [SPI] has received notices from the IRS owe approximately $11.8 million for unpaid tax liabilities, including penalties and interest. The balances reported on such notices do not represent the full payroll tax liability of as of August 31, 2023. The Company expects payroll tax liabilities, penalties and interest to increase in the future.

25. Put simply, clients were transferring funds to SPI with the understanding that those funds would be used in part to fund federal, state and local taxing authorities. That was not occurring as disclosed in the 10-K.

26. I came to learn while at SPI, that the failure to pay taxing authorities continued in 2024 with the obligation for just this year totaling about $6 million.

27. Of particular import, I learned that SPI and its professionals recently entered into discussions with the Internal Revenue Service ("IRS") to resolve all tax liabilities.

28. As a pre-condition to those negotiations, SPI represented to the IRS that it would on a going forward basis, begin to remit to the IRS the so-called "trust fund taxes" on behalf of employees hired by SPI clients.

29. Notwithstanding this promise to the IRS, SPI ceased making these payments to the IRS sometime in the past few weeks before my appointment.

30. It is important that as part of its core business, SPI pay required taxing authorities. It is expected by SPI's clients; it is expected by employees; it is expected by taxing authorities. Since being appointed CRO, I have required that any recently accrued tax obligations be paid to ensure compliance with applicable law and the expectations of various stakeholders.

5

31. ***Creditor obligations – vendors***. One of the first reports I was provided upon my appointment was an aging report of all outstanding payables.

32. The information I was provided was sobering. Altogether, SPI has outstanding payment obligations of about $8.4 million. Of this amount, over $7 million is over 120 days past due. Notably, this report **excludes** amounts separately owed to taxing authorities.

33. I have not yet completed my review whether the amounts owed to such vendors can be negotiated to a lower amount or disputed. I did notice a significant amount of vendors were outside counsel who were retained to represent SPI in litigation across the country which is addressed below.

34. ***Creditor obligations – litigation***. Litigation is a significant driver of costs at SPI. Although not broken out specifically in its latest 10-K, SPI appeared to be paying several million dollars in legal fees on an annual basis.

35. The litigation that SPI is a party to is extensive. Upon my appointment, I was provided a litigation summary of both pending and threatened litigation claims. Per that report, there is approximately twenty matters in which litigation is ongoing, or settlement achieved but obligations still remaining. There are likely other litigation claims not accounted for in this report based on separate letters I received from outside counsel representing SPI. Indeed, this Court has pending litigation before it in which SPI is being sued by another bankruptcy estate.

36. The total potential liability of all this litigation, including resolution with taxing authorities, is undetermined at this time. But what seems clear is that SPI does not have the ability to pay any meaningful judgment on an immediate basis if forced to do so. More concerning, SPI does not have sufficient cash resources on hand to pay professionals to defend all this litigation. This includes what will likely be significant fees that need to be paid to tax counsel to negotiate

any resolution with the IRS. Since my appointment, I have received several communications from law firms in which they are seeking to withdraw from representation due to non-payment over several months.

37. ***Creditor obligations – Balanced Management, LLC***. In July 2024, SPI entered into a secured loan agreement with Balanced Management, LLC ("BM").

38. The loan terms evidence the dire financial straits of the company.

39. In particular, BM lent SPI $500,000 after deducting a $103,750 origination fee. The loan documents I reviewed stated that SPI was then required to pay back the loan within twenty-eight weeks of origination with a total interest expense of $575,000 excluding the original principal balance of $603,750. On the disclosures provided by BM to SPI as part of the Loan Agreement, the annual percentage rate for the loan was 254.92%.

40. Notably, although the loan included a broad grant of a security interest in SPI's assets, BM did not file a financing statement contemporaneously with the origination of its loan.

41. Rather, based on documents I reviewed, SPI filed its financing statement on October 18, 2024, just ten days before these bankruptcy filings. Moreover, it did not include in its financing statements a description of its collateral.

42. ***Unexplained transactions***. In light of the pressing needs to keep the business running to maximize value for all stakeholders, I have not yet been able to complete a review of transfers that could be the subject of future litigation. As explained elsewhere in this declaration, the most important tasks were determining the viability of the business and the manner in which to protect the business if possible..

43. However, I did come upon certain transactions that appear to lack any business justification. In particular, I identified $3,430,000 that was transferred to a company called Media Network Consultants from April 2020 through May 2024.

44. From a review of public records, it appears that the manager of the company is William Beswick. I have come to learn that Mr. Beswick was a former employee of SPI.

45. I requested my professionals at Lawgical to review any electronically stored information relating to this company or Mr. Beswick. At least from an initial review of the electronically stored information, there was no meaningful trail of responsive materials. This was surprising considering the magnitude of payments to this third-party.

46. Separately, I asked certain employees to identify any written agreement with this company. Nothing could be located except for several one-page invoices that lacked any meaningful information of the services that were in fact being provided to SPI for such significant sums. For example, a November 2023 invoice only contains the following information:

**MEDIA NETWORK CONSULTANTS LLC**
13245 Lower Harden Avenue
Orlando
32827
4073308848
media1@protonmail.com

**INVOICE**
INV1250

**DATE**
Nov 20, 2023

**DUE**
On Receipt

**BALANCE DUE**
USD $100,000.00

**BILL TO**
Shiftpixy, Inc.
500 Brickell Key Dr. Suite 300
Miami, FL
33131
888-798-9100
scott.absher@shiftpixy.com

| DESCRIPTION | RATE | QTY | AMOUNT |
|---|---|---|---|
| Consulting Services/ Branding Awareness | $100,000.00 | 1 | $100,000.00 |

47. Considering the aggregate number of payments, the whole dollar amounts involved, lack of documentation and the use of a proton email address, further investigation of these transfers is warranted.

48. I did in fact call Mr. Beswick as a means to get more information about the vendor relationship. On the call, I requested he provide a copy of the contract with SPI. He told me "he would get back to me on that." Mr. Beswick did not pick up or return any further calls from me.

**D. Reason for Filing and Purpose of Chapter 11 Filings**

49. Based on limited cash resources, pending litigation threats to the business that were putting even more pressure on those cash resources, the possibility that certain assets could be sold and the just recent filing by BM of its financing statement, I made the recommendation to the Board of Directors of SPI that SPI seek bankruptcy protection. The Board of Directors accepted this recommendation.

50. The goals of these bankruptcy cases are modest and straightforward.

51. It is likely that the Debtors will not be able to reorganize in the traditional sense. However, chapter 11 is the most viable pathway to sell the assets of the Debtors as going concern.[2]

52. Two particular things must occur in these cases, one that demands urgency while the other can happen at a more deliberate pace.

53. The first substantive task that requires urgency is a potential strategic sale of the business. As explained above, the core business of SPI is estimated to generate about $16.8 million in annual revenue.

54. The multi-million dollar client book, along with the associated technology and data developed around it, may have significant value to a strategic buyer. Considering the significant

---

[2] Once the sale is complete there are various options to resolve the cases including a liquidating plan or conversion at that point to chapter 7.

litigation and solvency issues surrounding SPI, the sale process provided under Section 363 of the Bankruptcy Code is particularly advantageous in this instance to realize maximum value. And considering the timing of BM's financing statement and that it is almost certainly avoidable as a preferential transfer, the value realized from any sale will not be exclusive to one creditor.

55. While the sale process is ongoing, it is critical that certain employees remain in place to service existing client relationships or assist with a sale and that the technology surrounding the core business be maintained.

56. The second substantive task that can be done in a more deliberate manner is an investigation of historical transfers by SPI and its affiliates along with the actions of officers and directors of the company. As to the latter point, there appears to be one or more insurance policies that may be a source of recovery for creditors independent of these individuals' ability to pay any litigation exposure. The manner in which this investigation or any litigation is pursued can be accomplished through confirmation of a liquidating plan and the appointment of an independent liquidating trustee, or if the Court deems appropriate, a chapter 7 trustee.

57. There are other tasks that must be accomplished in which the Bankruptcy Code affords advantages that cannot be realized elsewhere. For example, the streamlined claims resolution process in this forum versus litigation in multiple forums to adjudicate SPI's liability.

### E. First Day Motions

58. There are several motions in which we are seeking immediate relief from the Court:

   a. <u>Motion to Use Cash Collateral</u>. I am seeking to use the Debtors' cash on hand and the cash that is generated from its clients over the next few weeks to keep the operations going and bridge these assets to a sale. The only UCC-1 filing statement that I have located is from BM, which as discussed further in the motion.. The UCC-

1 appears to be presumptively subject to avoidance as a preference. Moreover, it fails to include a description of the collateral. Finally, there is no deposit control agreement that I have been able to locate, nor does BM have control over the Debtors' cash.

b. <u>Motion to Pay Prepetition Employees</u>. The Debtor pays its employees semi-monthly. I have identified several employees that I need to retain to assist with the initial stages of these Chapter 11 filings and to assist with keeping the operations going to maximize the value of the Debtors assets. Further details of the employees to be retained are provided for in the motion. No employee will be receiving any amount in excess of the limits provided for in 11 U.S.C. §507(a)(4).

c. <u>*Retention of DGIM Law, PLLC*</u>. I have sought to have the Court approve the retention of DGIM Law, PLLC ("DGIM"). The Debtors are Wyoming corporations and need to have representation to proceed in any bankruptcy proceeding. DGIM is disinterested as reflected in the affidavit of Isaac Marcushamer that accompanies the DGIM application. The attorneys at DGIM have several decades of experience before the Bankruptcy Court in the Southern District of Florida.

d. <u>Retention of Jonathan Feldman</u>. This is my retention application. As stated therein, I have not received any payment for any work prepetition, and I am not seeking any payment for that work. My fee arrangement is as proposed in my application. Since my appointment, I have displaced prior management with respect to all business decisions and it is my intention, should my application be approved by the Court, to position the Debtors for a sale as soon as possible.

    *e.*    <u>Maintenance of Bank Accounts</u>. The Debtors core business as described above is providing payroll services to its clients. To that end, its banking arrangement relies upon a variety of accounts where funds from clients are remitted and then payments are made to individuals who are working on behalf of the clients as well as to the benefit providers and then to the government taxing agencies. It would be highly disruptive to the Debtor's business model to close and reopen all of those accounts. Accordingly, as provided for in the Motion the Debtors are seeking authority to keep the existing accounts in place, and to open a Debtor in possession account where all excess cash in an amount greater than $50,000.00 at the end of the month would be held pending Court approval.

59.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated October 30, 2024

By: <u>/s/ Jonathan Feldman</u>
Jonathan Feldman, CRO to the Debtors and Debtors in Possession