## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

SHIFTPIXY, INC., et al.[1]

                    Debtor.

Chapter 7

Case No.: 24-21209-LMI

## XL SPECIALTY INSURANCE COMPANY'S MOTION FOR ENTRY OF AN ORDER THAT THE PROCEEDS OF SIDE A DIRECTORS' AND OFFICERS' LIABILITY INSURANCE POLICIES ARE NOT PROPERTY OF THE DEBTORS' ESTATES AND ARE NOT SUBJECT TO THE AUTOMATIC STAY; OR IN THE ALTERNATIVE, RELIEF FROM THE STAY

XL Specialty Insurance Company ("XL Specialty"), by and through its undersigned counsel, enters a limited appearance solely for the purpose of moving the Court, pursuant to 11 U.S.C. §105(a), 11 U.S. C. §362(d)(1) and Bankruptcy Rule 4001(a), for an order declaring that the proceeds of "Side A" directors' and officers' insurance policies are not property of the Debtors' estate and/or the automatic stay does not apply. In the event the Court concludes otherwise, XL Specialty requests relief from the automatic stay. XL Specialty does not consent to jurisdiction for any other purpose. The grounds for this Motion are set forth below. A Proposed Order is attached hereto as **Exhibit A**.

### JURISDICTION

1. This Court has jurisdiction to consider this this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §1409.

---

[1] The Debtors are: (i) Shiftpixy, Inc., (ii) Shiftpixy Staffing, Inc.; and (iii) ReThink Human Capital Management, Inc. The address of the Debtors in 1401 NW 25th Street, Miami, Florida, 33142.

## FACTUAL BACKGROUND

2.     On October 28, 2024, Shiftpixy, Inc., Shiftpixy Staffing, Inc., and ReThink Human Capital Management, Inc. (the "Debtors") filed Chapter 11 Voluntary Petitions for Relief (ECF Doc. 1) in this Court.  On January 31, 2025, Shiftpixy, Inc.'s case was converted to Chapter 7 of the Bankruptcy Code.

### A.     The Side A D&O Policies

3.     Before the Petition Date, XL Specialty issued successive Executive and Corporate Securities Liability Insurance Policies to the Debtor, Shiftpixy, Inc.: (1) No. ELU190927-23 issued for the claims made period June 30, 2023 to June 30, 2024, and extended to June 30, 2025; and (2) Policy No. ELU183856-22 issued for the claims made period June 30, 2022 to June 30, 2023 (collectively, the "Policies").  The Policies are attached hereto as **Exhibit B** and **Exhibit C**.

4.     Importantly, coverage under the Policies is limited to direct coverage of individual **Insured Persons** only for **Claims** made against them that are not indemnified by Shiftpixy, Inc. (as the **Parent Company**) or its **Subsidiaries**.[2]  The Policies provide no coverage for any **Claims** made against the Debtors.  Nor do they provide coverage for amounts the Debtors may have paid or may owe as indemnification to individual directors and officers.

5.     More specifically, Endorsement No. 2 to the Policies deleted all of the Insuring Agreements that would have provided coverage to the Debtors.  The only Insuring Agreement not deleted by Endorsement No. 2 is Insuring Agreement I(A).  *See* Policies Section I, as amended by Endorsement No. 2 (Ex. B at p. 31; Ex. C. at p. 29).  Insuring Agreement I(A) states:

> The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay as indemnification.

---

[2] Words appearing in bold are defined terms under the Policies.

Ex. B at p. 15; Ex. C. at p. 14.  The Policies therefore only provide coverage to the **Insured Persons** for **Loss** resulting from **Claims** against those **Insured Persons** that is not indemnified by the Debtors.  As such, the Policies are said to provide only "Side A" coverage (sometimes called "Coverage A").

6.       Consistent with the deletion of Insuring Agreements I(B) through I(F), Endorsement No. 2 amends the Policies' definition of **Insured** to limit it to **Insured Persons**. (Ex. B at p. 31; Ex. C at p. 29.)  The Debtors are not **Insureds**.  The Policies define **Insured Person** to mean individual directors, officers or in limited circumstances, employees of the **Company** (i.e., the Debtors) or a subsidiary. (Ex. B. at Section II(J), p. 17; Ex. C at Section II(J), at p. 16.)  Because the Debtors are neither an **Insured** nor an **Insured Person**, the Policies provide no coverage whatsoever to the Debtors.

7.       Under the Policies, coverage therefore is limited to **Loss** resulting from **Claims** against the **Insureds Persons** to the extent such **Claims** are within the scope of Insuring Agreement I(A) and not excluded by a policy exclusion or some other provision.

8.       Where a **Claim** against an **Insured Person** is within the scope of Insuring Agreement I(A), the Policies provide coverage solely for their **Defense Expenses** and other **Loss**, including damages, judgments, settlements or other amounts that are insurable by law.  (Ex. B at Section II(O), as amended by Endorsement Nos. 3, 8, pp. 18, 34, 39; Ex. C at Section II(O), as amended by Endorsement Nos. 1, 3, 8, pp. 17, 28, 32, 37.)

**B.**       **The Lawsuits**

9.       To date, XL Specialty has received notice of certain **Claims** made against certain directors and officers who are **Insured Persons** under the Policies, including the following lawsuits:

    a. *WG1, LLC, et al. v. Shiftpixy, Inc., et al.,* Case No. 30-2023-01338891 (Super. Court Orange Cty., CA) (dismissed without prejudice);

    b. *Robert Angueira v. Shiftpixy, Inc., et al.*, Adv. Proc. No. 23-01257-LMI (Bankr. S.D. Fla.) (the "Angueira Action") (pending);

    c. *Apizza, LLC v. Rethink Human Capital Management, Inc., d/b/a Shiftpixy, et al.*, Case No. 30-2024-01385218 (Super. Ct., Orange Cty., CA) (pending);

    d. *Diamondback DTNM, LLC et al. v. Shiftpixy, Inc. et al.*, Case No. 8:24-cv-01278 (C.D. Cal.) (dismissed as against the individual defendant); and

    e. *Golden West Wings LLC, et al. v. Shiftpixy, Inc. et al.,* Case No. 8:24-cv-01537 (C.D. Cal.) (pending).

10.    The **Insured Persons** have requested coverage for the lawsuits under the Policies. XL Specialty has not denied coverage for the lawsuits but rather is proceeding under a reservation of rights regarding the scope of coverage potentially available.

11.    Although the filing of these bankruptcy cases stayed certain of the lawsuits as against the Debtor(s), the cases that remain pending have not been stayed as to individual **Insured Persons**.  Those **Insured Persons** are incurring and will continue to incur **Loss**, including legal fees and costs, in connection with the lawsuits and any future **Claims** that may be made against them.  The **Insured Persons** are not being indemnified by the Debtors.

12.    A settlement has been reached among the parties in the *Angueira* Action that contemplates payment by XL Specialty from the 2023-2025 Policy and is contingent on the granting of this motion.

13.    On November 14, 2024, counsel for certain **Insured Persons** filed a motion with this Court seeking stay relief regarding the payment of defense expenses under the 2023-2025

Policy for one of the five lawsuits.  *See* ECF No. 54.  XL Specialty was not advised of that motion before it was filed and did not join the motion.  On December 18, 2024, this Court granted the alternative (but incomplete) relief sought in that motion–that is, relief from the bankruptcy stay to permit the payment of defense expenses for only one of the five pending lawsuits.  ECF No. 141.  However, because the motion did not properly address the threshold issue that the proceeds of a Side A only insurance policy are not property of the Debtors' Estate, the Court did not address it.  *Id.* at ¶2.  Nonetheless, the Order states that nothing therein shall preclude a party-in-interest from seeking modification of the Order.  *Id.* at ¶4.

14.    XL Specialty is agreeable to payments from the Policies' proceeds on behalf of the **Insured Persons** for **Claims** against them—including **Defense Expenses** and settlements that are negotiated to resolve the **Claims**—subject to clarification from this Court that the proceeds of the Side A Policies in fact are not property of the Debtors' Estates and/or that payments of such proceeds are not precluded by the bankruptcy stay.

## BASIS FOR RELIEF REQUESTED

15.    By this Motion, XL Specialty requests entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, declaring that the proceeds of the Policies are not the property of the Debtors' Estates and/or are not subject to the automatic stay so that XL Specialty may provide coverage under the Policies.  A declaration of this issue is necessary and appropriate in light of the earlier motion improvidently filed on behalf of certain **Insured Persons** that addressed only the advancement of defense expenses for only one of several pending lawsuits.  The earlier motion also failed to properly advise the Court that the Policies are Side A only and, as such, the proceeds are not property of the Debtors' Estates subject to the bankruptcy stay under well-established and controlling law.

A.      **The Proceeds of Side A Policies Are Not Property of the Debtors' Estate**

16.      The proceeds of the Side A Policies are not property of the Debtors' estate under Section 541(a) of the Bankruptcy Code because the Policies provide no coverage to the Debtors. The automatic stay in Section 362 therefore does not apply to the proceeds.

17.      Despite the broad definition of "property of the estate" in Section 541(a), the proceeds of a D&O liability policy do not necessarily belong to the estate merely because the underlying insurance policies themselves may be estate property. *See La. World Exposition, Inc. v. Federal Ins. Co.*, 832 F.2d 1391, 1399 (5th Cir. 1987). Indeed, the Fifth Circuit has consistently held that "when a debtor corporation owns a liability policy that *exclusively* covers its directors and officers, we know from *Louisiana World Exposition* that the proceeds of that director and officer policy are *not* part of the debtor's bankruptcy estate …" *Homsy v. Floyd (In re Vitek, Inc.)*, 51 F.3d 530, 535 (5th Cir. 1995) (original emphasis); *see also In re Edgeworth*, 993 F.2d 51, 55–56 (5th Cir. 1993) ("[W]hen the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate."). Whether insurance proceeds constitute estate property turns on whether a debtor has the right to retain the proceeds in the absence of a bankruptcy proceeding. *See In re Edgeworth*, 993 F.2d at 55.

18.      The distinction between ownership of insurance policies and their proceeds is important because even "when the debtor is the owner of the insurance policy but does not have a right to the proceeds, the debtor cannot transfer the proceeds because the commencement of the bankruptcy case does not create such interest." *In re Archdiocese of Saint Paul and Minneapolis*, 579 B.R. 188, 201 (Bankr. D. Minn. 2017).

19.      Bankruptcy courts in this and other jurisdictions have adopted the *Louisiana World Exposition* analysis and likewise distinguish between D&O policies and their proceeds in

6

analyzing whether proceeds are or are not estate property. *See, e.g., In re CHS Electronics*, *Inc.*, 261 B.R. 538, 541-542 (Bankr. S.D. Fla. 2001); *In re Laminate Kingdom, LLC*, No. 07–10279–BKC–AJC, 2008 WL 1766637, at *2 (Bankr. S.D. Fla. Mar. 13, 2008); *In re Allied Digital Tech. Corp.*, 306 B.R. 505, 510-512 (Bankr. D. Del. 2004); *In re MF Global Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012); *In re World Health Alternatives, Inc.,* 369 B.R. 805, 810 (Bankr. D. Del. 2007).

20.     Because Side A only D&O policies provide no coverage to the corporation, courts routinely hold that their proceeds are not property of the estate.  As explained in *Allied Digital*: "when insurance policies provide direct coverage to directors and officers, the proceeds of the insurance polic[ies] are not property of the bankruptcy estate because the proceeds are payable to the directors and officers not the estate."  306 B.R. at 510.  *See also In re SVB Fin. Grp.*, 650 B.R. 790, 799 & n.3 (Bankr. S.D.N.Y. 2023) (holding that Side A Policies were not property of the estate and explaining that "when an insurance policy provides exclusive coverage to directors and officers, courts have generally held that the proceeds are not property of the estate"); *In re MF Global Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) (same); *In re World Health Alternatives, Inc.,* 369 B.R. 805, 810 (Bankr. D. Del. 2007) (same); *In re Daisy Sys. Sec. Litig.,* 132 B.R. 752, 755 (N.D. Cal. 1991) (where the D&O policies only provided direct coverage to the directors and officers, "the proceeds of the three DOL policies in this case are not simply assets of Daisy's bankruptcy estate to be divided among creditors according to bankruptcy law").

21.     Here, the Side A Policies provide coverage exclusively to the individual **Insured Persons** for **Defense Expenses** and other **Loss** that they may incur as a result of **Claims** made against them.  The Policies provide no coverage whatsoever to the Debtors, either for any claims made against the Debtors nor for amounts that Debtors may have paid or may owe as

indemnification to the directors and officers. Therefore, the proceeds of the Side A Policies very clearly are not property of the Debtors' estates and are not assets that a bankruptcy trustee or estate creditors can claim should be preserved and distributed for their benefit.

22. Finally, courts have rejected arguments by bankruptcy trustees and other claimants that they should be permitted to restrict the use of or preserve policy proceeds that are not property of the estate in order to satisfy claims they may assert against insured directors and officers. As explained in *CHS Electronics*:

> Cooper's [the Liquidating Trustee] efforts to protect sufficient insurance proceeds to satisfy what he believes will be a large judgment against the Debtor's former officers and directors is certainly consistent with a general policy in favor of maximizing the size of a bankruptcy estate. Unfortunately, Cooper could not cite to, and this Court is unaware of, any Bankruptcy Code provision or case law that would give a bankruptcy trustee any different status than a non-bankruptcy plaintiff with an unliquidated claim against third-parties which may be covered by insurance proceeds about to be used to settle or satisfy a judgment entered in favor of other plaintiffs. …
>
> As discussed earlier, this contested matter does not involve insurance proceeds which are property of the estate. Rather, what is at issue are the rights of a bankruptcy trustee in his role as a competing claimant. Simply because Cooper is a trustee in bankruptcy does not arm him with super-plaintiff powers in causes of actions between third parties. … [A] trustee (or, like Cooper, a liquidating trustee under a plan) generally stands in the shoes of the debtor. A trustee has certain strong-arm powers under § 544 of the Bankruptcy Code which give the trustee the rights of hypothetical lien creditors and bona fide purchasers in actions to avoid certain transfers or liens. None of those powers are applicable here. Rather, … "the estate is merely another litigant wishing to pursue claims against the Ds and Os." Therefore, this Court rejects Cooper's contention that this Court should abstain from making any finding with respect to Cooper's rights to delay or object to use of the Proceeds in favor of consideration by the district court.

261 B.R. at 544 (citations omitted, cleaned up). *See also MF Global Holdings*, 469 B.R. at 196-197 (accord); *Ochs v. Lipson (In re First Central Fin. Corp.)*, 238 B.R. 9, 15 (Bankr. E.D.N.Y. 1999) (same).

23. Accordingly, because the proceeds of the Side A Policies are not property of the Debtors' Estates, the stay does not apply to payments of such proceeds under the Policies. Nor

8

are such payments subject to delay, oversight or objection by parties asserting claims against the **Insured Persons**, whose interest is to maximize their own recovery as litigants but who have no right to the proceeds in any respect.

**B.**     **In the Event the Court Declines to Find that the Proceeds Are Not Property of the Debtors' Estates, Good Cause Exists to Grant Relief from the Automatic Stay.**

24.     As stated above, under controlling law, the automatic stay does not apply to the proceeds of the Policies, and XL Specialty therefore should not be precluded by the stay from making payments from the proceeds on behalf of the **Insured Persons**.  In the event the Court declines to grant the relief requested above, cause would exist to grant relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), to allow XL Specialty to make payments of the Policies' proceeds on behalf of the **Insured Persons** for their **Defense Expenses** and other **Loss**.

25.     Section 362(d)(1) of the Bankruptcy Code states that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay…for cause[.]" 11 U.S.C. § 362(d)(1).  "Cause" is not defined in the Bankruptcy Code. Instead, "cause" is a flexible concept for which courts conduct a case-by-case balancing test of the *Sonnax* factors to determine whether sufficient cause exists to lift the automatic stay, though not all of the *Sonnax* factors are relevant in every case.  *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990) (listing twelve factors to analyze when determining whether to lift the automatic stay); *Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) ("Not every one of these [*Sonnax*] factors will be relevant in every case. [citation omitted.] The ultimate determination whether to lift a stay depends upon the facts underlying a given motion.");

*In re SVB Financial*, 650 B.R. at 798-99 ("Not all of the *Sonnax* factors are relevant in every case, and 'cause' is a flexible concept that must be determined on a case-by-case basis.")

26.     Bankruptcy courts have frequently granted relief from stay for directors and officers to access insurance proceeds for defense costs. *See, e.g., In re Downey Financial Corp.*, 428 B.R. 495 (Bankr. D. Del. 2010); *In re Arter & Hadden, L.L.P.*, 335 B.R. 666 (Bankr. N.D. Ohio 2005). Those courts find "cause" because failure to modify the automatic stay would effectively end the directors' ability to defend lawsuits. *In re Arter & Hadden*, 335 B.R. at 674. Here, the **Insured Persons** are in substantial need of the Policies' proceeds to defend the suits filed against them because their legal fees are not being indemnified by the Debtors.

27.     Relief from the stay also is appropriate to allow policy proceeds to be used to settle **Claims** against the **Insured Persons**. In the absence of insurance coverage to pay settlements, the **Insured Persons** will be significantly prejudiced because they would be exposed to potentially greater liability and exposure where the Debtors have refused to provide indemnification.

28.     By contrast, the Debtors in this case will not suffer any prejudice from the payment of the Policies' proceeds on behalf of the **Insured Persons**. As detailed above, the Debtors are not insured in any respect under the Policies and have no right to receive proceeds of the Policies. To the extent the Debtors' Estates or the trustee may seek to preserve the proceeds based on their interests as potential claimants against the **Insured Persons**, they have no right to do so.

29.     Accordingly, cause exists to grant relief from the automatic stay for the purpose of allowing XL Specialty to pay Defense Expenses and negotiate and pay settlements or judgments from the proceeds of the Policies.

81033301;1

## CONCLUSION

WHEREFORE, XL Specialty respectfully requests that this Court grant this Motion and declare that the proceeds of the Side A Policies are not property of the Debtors' estate and are not subject to the automatic stay such that XL Specialty may make payments from the Policies' proceeds on behalf of **Insured Persons**.  In the event the Court declines to so find, XL Specialty requests relief from the automatic stay to allow it to make payments from the Policies' proceeds on behalf of **Insured Persons**.

Dated: April 18, 2025         Respectfully submitted,

By:   /s/ *Luis R. Casas*
      Luis R. Casas, Esq.
      Florida Bar No. 094222
      luis.casasmeyer@akerman.com
      janet.salinas@akerman.com
      **AKERMAN LLP**
      Three Brickell City Centre
      98 Southeast Seventh Street
      Suite 1100
      Miami, FL  33131
      Tel: 305-374-5600
      Fax: 305-374-5095

      *Counsel for XL Specialty Insurance Company*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 18, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case.

By:   /s/ *Luis R. Casas*
      Luis R. Casas, Esq.

81033301;1

# EXHIBIT A

PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| SHIFTPIXY, INC., et al.[3] | Case No.: 24-21209-LMI |
| Debtor. | |

**ORDER GRANTING XL SPECIALTY INSURANCE COMPANY'S MOTION FOR ENTRY OF AN ORDER THAT THE PROCEEDS OF SIDE A DIRECTORS' AND OFFICERS' LIABILITY INSURANCE POLICIES ARE NOT PROPERTY OF THE DEBTORS' ESTATES AND ARE NOT SUBJECT TO THE AUTOMATIC STAY; OR IN THE ALTERNATIVE, RELIEF FROM THE STAY**

The Court held a hearing on _____. 2025 on the motion (the "Motion")[4] of XL Specialty Insurance Company ("XL Specialty") for entry of an order (this "Order") that the proceeds of the Side A Directors' and Officers' Liability Policies issued by XL Specialty to the

---

[3] The Debtors are: (i) Shiftpixy, Inc., (ii) Shiftpixy Staffing, Inc.; and (iii) ReThink Human Capital Management, Inc.  The address of the Debtors in 1401 NW 25th Street, Miami, Florida, 33142.

[4] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

Debtor Shiftpixy, Inc. are not the property of the Debtors' Estates and therefore are not subject to the automatic stay; or in the alternative, granting relief from the stay; and having found that XL Specialty's notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having considered all responses to such Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the findings and relief granted herein; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED**.

2.      This Court declares that the proceeds of the Side A Policies issued by XL Specialty to the Debtor Shiftpixy, Inc. are not the property of the Debtors' Estates under 11 U.S.C. §541 and are not subject to the automatic stay under 11 U.S.C. §362.  XL Specialty may pay the proceeds of the Policies on behalf of **Insured Persons** without violating the automatic stay.

3.      The relief set forth herein does not waive any party's rights to assert any other rights, claims, or defenses in any other proceeding.

4.      Nothing in the Motion or this Order shall constitute or be construed as: (a) a waiver of the rights of any party regarding coverage under the Policies for any matter; (b) a decision or finding by this Court regarding coverage for any matter under the Policies; (c) an alteration, amendment, modification, revision, or otherwise change to the Policies or any rights or obligations thereunder; or (d) a waiver of any rights and defenses of any party under the Policies or under applicable non-bankruptcy law (this paragraph 4 and the rights referenced therein, the "Reservation of Rights").

5.      All amounts paid by XL Specialty under the Policies shall not be subject to disgorgement or avoidance by the Debtors' estate, the Chapter 7 trustee, or any other fiduciary appointed thereafter, regardless of the date of such payment.

6.      This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

###

Submitted by:

Luis R. Casas, Esq.
*Counsel for XL Specialty Insurance Company*
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, 11th Floor
Miami, Florida 33131
Phone: (305) 374-5600
Fax: (305) 374-5095
E-mail: luis.casasmeyer@akerman.com

*Attorney Casas is directed to serve a copy of this Order on all interested parties and file a certificate of service with the Court.*

## **EXHIBIT B**

INSURANCE POLICY NO. ELU190927-23

| | |
|---|---|
| Policy Number: ELU190927-23 | **XL Specialty Insurance Company** |
| Renewal of Number: ELU183856-22 | Members of the XL America Companies |

---

### EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE POLICY DECLARATIONS

**Regulatory Office**
505 Eagleview Blvd. Suite 100
Dept: Regulatory
Exton, PA 19341-1120
Telephone 800-688-1840

**Executive Offices**
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

---

**Item 1.   Name and Mailing Address of Parent Company:**

Shiftpixy, Inc.
501 Brickell Key Drive
Suite 300
Miami, FL  33178

---

**Item 2.   Policy Period:**   Inception Date: June 30, 2023   Expiration Date: June 30, 2024

**At 12:01AM Standard Time at your Mailing Address Shown Above**

---

**Item 3.   Limit of Liability:**

(A) $250,000   Maximum Aggregate Sublimit of Liability each **Policy Period** for all **Investigation Demands**

(B) $5,000,000   Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Loss** from all **Claims**, **Investigation Demands** and **Interviews**

---

**Item 4.   Retentions:**

| | |
|---|---|
| $0 | each **Insured Person** under INSURING AGREEMENT I (A) or (D) |
| N/A | each **Claim**, other than a **Securities Claim**, under INSURING AGREEMENT I (B) or **Interview** under INSURING AGREEMENT I (E) |
| N/A | each **Securities Claim** under INSURING AGREEMENT I (B) or (C) |
| $0 | each **Investigation Demand** under INSURING AGREEMENT I (F) |

---

**Item 5.   Optional Extension Period:**

Length of Optional Extension Period:   One Year after the end of the **Policy Period**, if elected.

Premium for Optional Extension Period:                                              $760,000.00

---

**Item 6.   Pending and Prior Litigation Date:**                              June 30, 2021

---

**Item 7.   Notices required to be given to the Insurer must be addressed to:**

XL Professional Insurance
100 Constitution Plaza, 17th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636 or proclaimnewnotices@axaxl.com

---

**Item 8.   Premium:**

Taxes, Surcharges or Fees:              $2,660.00

Total Policy Premium:              $380,000.00

---

**Item 9.   Policy Forms and Endorsements Attached at Issuance:**

BR 71 00 09 14    BR 72 27 03 15    BR 80 507 10 20    BR 80 454 08 19    BR 80 91 02 16    BR 80 51 08 15    BR 80 39 06 15

---

© 2022 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE POLICY DECLARATIONS**

BR 83 56 08 16   BRX 80 38 03 17   BR 80 84 12 15   BR 80 253 03 17

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

# IN WITNESS

## XL SPECIALTY INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

_____
Joseph Tocco
President

_____
Toni Ann Perkins
Secretary

LAD 400 0915 XLS
© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM**
**INSURANCE COVERAGE**

Coverage for acts of terrorism is included in your policy. You are hereby notified that the Terrorism Risk Insurance Act, as amended in 2019, defines an act of terrorism in  Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States —to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is waived and does not include any charges for the portion of losses covered by the United States government under the Act.

PN161 12 20 T

© 2020 X.L. America, Inc.
Includes copyrighted material of National Association of Insurance Commissioners, with its permission.

## NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 0519

©2019 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## NOTICE TO POLICYHOLDERS

**PRIVACY POLICY**

The AXA XL insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality.  For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies.  For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way.  In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

**Our Privacy Promise**

Your privacy and the confidentiality of your business records are important to us.  Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products.  We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you.  Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

**Collection and Sources of Information**

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services.  The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you.  The information we collect will vary with the type of insurance you seek;

PN CW 02 0119                                                                                    Page 1 of 3

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies.  The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you.  We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so.  The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim.  In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit.  We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

<u>Retention and Correction of Personal Information</u>

We retain personal information only as long as required by our business practices and applicable law.  If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

<u>Storage of Personal Information</u>

We have in place safeguards to protect data and paper files containing personal information.

<u>Sharing/Disclosing of Personal Information</u>

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law.  Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party.  Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment.  "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc.  We also do not disclose to any unaffiliated third party a policy or account number for use in marketing.  We may share with our affiliated companies information that relates to our experience and transactions with the customer.

<u>Policy for Personal Information Relating to Nonpublic Personal Health Information</u>

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed.  However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 0119

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| | |
|---|---|
| **Alabama** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. |
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **California** | For your protection California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING**: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance that such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |

© 2023 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms**: Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire**: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING**: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.<br><br>**WARNING: All Workers Compensation Insurance**:<br>Any person or entity who makes any material false statement or representation, who willfully and knowingly omits or conceals any material information, or who employs any device, scheme, or artifice, or who aids and abets any person for the purpose of:<br>1.  obtaining any benefit or payment,<br>2.  increasing any claim for benefit or payment, or<br>3.  obtaining workers' compensation coverage under the Administrative Workers' Compensation Act, shall be guilty of a felony punishable pursuant to Section 1663 of Title 21 of the Oklahoma Statutes. |

© 2023 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Pennsylvania** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. |
| | **Automobile Insurance**: Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| | **Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2023 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

**FLORIDA**

**FOR INFORMATION, OR
TO MAKE A COMPLAINT, CALL:
1-800-622-7311
AXA XL
SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT  06902-6040**

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE COVERAGE FORM**

**TABLE OF CONTENTS**

I.   INSURING AGREEMENTS ................................................................................................ 1

II.  DEFINITIONS .......................................................................................................... 2-6

III. EXCLUSIONS .......................................................................................................... 6-8

IV.  LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS ........................................ 8

V.   DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS……………………………………8-9

VI.  GENERAL CONDITIONS ............................................................................................ 9

    (A) NOTICE .............................................................................................................. 9

    (B) INTERRELATED CLAIMS ...................................................................................... 10

    (C) OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES ............................................................................................... 10

    (D) MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL) ......................... 10

    (E) CANCELLATION AND RENEWAL OF COVERAGE ....................................................... 11

    (F) OPTIONAL EXTENSION PERIOD ............................................................................ 11

    (G) ASSISTANCE, COOPERATION AND SUBROGATION ................................................... 12

    (H) EXHAUSTION ..................................................................................................... 12

    (I) REPRESENTATION CLAUSE .................................................................................. 12

    (J) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY ............ 12

    (K) AUTHORIZATION AND NOTICES ........................................................................... 13

    (L) PRIORITY OF PAYMENTS .................................................................................... 13

    (M) BANKRUPTCY ................................................................................................... 13

    (N) ENTIRE AGREEMENT – WORLDWIDE COVERAGE ................................................... 13

    (O) CURRENCY ....................................................................................................... 14

BR TOC 0914

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE COVERAGE FORM**

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the "Insurer"), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

## I.  INSURING AGREEMENTS

(A)  The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)  The Insurer shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification.

(C)  The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act.**

(D)  The Insurer shall pay on behalf of the **Insured Persons Defense Expenses** resulting from an **Interview**, except for **Defense Expenses** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(E)  The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Insured Persons** resulting from an **Interview** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** such **Defense Expenses**.

(F)  The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Company** resulting from any **Investigation Demand** first made during the **Policy Period**.

## II.  DEFINITIONS

(A)  **"Application"** means:

    (1)  any application, including attachments thereto, or any written information or representation, provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting of this Policy; and

    (2)  any publicly available document filed by the **Company** with the U.S. Securities and Exchange Commission or any state, local or foreign equivalent during the twelve (12) months preceding this Policy's Inception Date.

(B)  **"Change In Control"** means:

    (1)  the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity; or

    (2)  any person, entity or an affiliated group of persons or entities acting together,  acquire (a) interest representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of the majority of the directors, management committee members or members of the board of managers of the **Parent Company**, as applicable to its organization, or (b) such rights pursuant to written contract or the by-laws, charter, operating agreement or similar document of the **Parent Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(C)    "**Claim**" means:

    (1)    any written demand (other than an **Investigation Demand**) for:

        (a)    monetary or non-monetary relief, including injunctive relief; or

        (b)    arbitration,  mediation or other alternative dispute resolution proceeding;

    (2)    any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)    service of a complaint or similar pleading;

        (b)    return of an indictment, information, notice of charges or similar document;

        (c)    an official written request for extradition of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of extradition**;**

    (3)    any investigation of an **Insured Person** commenced by a written statement from an **Enforcement Authority** identifying such **Insured Person** as the subject of an investigation, including any target letter, Wells Notice or similar document;

    (4)    any subpoena served upon an **Insured Person** for testimony or documents in connection with a formal or informal investigation of the **Company** by any **Enforcement Authority**; and

    (5)    any **Corporate Manslaughter Charge**.

(D)    "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D). The term **Company** shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction.

(E)    "**Corporate Manslaughter Charge**" means a formal criminal proceeding commenced in the United Kingdom against an **Insured Person** of the **Company** domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**.

(F)    "**Defense Expenses**" means reasonable and necessary legal fees, expenses and other costs (including experts' fees):

    (1)    incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim, Investigation Demand** or **Interview**, including any preparation for such an **Interview**;

    (2)    incurred due to the arrest and detainment or incarceration of any **Insured Person** in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**;

    (3)    incurred in connection with any **Claim** under section 304 of the Sarbanes-Oxley Act of 2002 or imposed pursuant to section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; or

    (4)    incurred in the defense of any **Corporate Manslaughter Charge**;

**Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)     "**Employment Practices Wrongful Act**" means any actual or alleged:

    (1)     wrongful termination of employment whether actual or constructive;

    (2)     employment discrimination of any kind, including violation of any federal, state or local law involving employment or discrimination in employment, which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

    (3)     sexual or other harassment in the workplace; or

    (4)     wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, refusal to hire, negligent hiring, or negligent supervision.

(H)     "**Enforcement Authority**" means any federal, state, local or foreign law enforcement or governmental regulatory authority, including the United States Departments of Justice and Labor, Securities and Exchange Commission, attorneys general, or the enforcement unit of any securities exchange or similar self-regulatory organization.

(I)     "**Insured**" means the **Insured Persons** and the **Company**.

(J)     "**Insured Person**" means:

    (1)     any past, present or future natural person director or officer, or member or manager of the board of managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    (2)     any past, present or future natural person employee of the **Company** (other than an individual described in (J)(1) above) to the extent any **Claim** is: (a) a **Securities Claim**, or (b) made and maintained against both such employee and an **Insured Person** as defined in (J)(1) above;

    (3)     an individual identified in (J)(1) above who, with the consent of the **Company**, is or was serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

    (4)     any individual identified in (J)(1) above who, with the consent of the **Company** is or was serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

    In addition:

    In the event of the death, incapacity or bankruptcy of any individual identified above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

    The coverage otherwise available under this Policy to any **Insured Person** will be extended to such **Insured Person's** lawful spouse or domestic partner, but only to the extent such spouse or domestic partner is a party to any **Claim** solely in his or her capacity as a spouse or domestic partner of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner.

(K)     "**Interrelated Wrongful Acts**" means any **Wrongful Acts**, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(L)  "**Interview**" means:

(1)  a written request first received by an **Insured Person** during the **Policy Period** for a voluntary interview, meeting or sworn statement by:

(a)  any **Enforcement Authority**; or

(b)  the **Company** in connection with an **Investigation Demand** or an investigation or other inquiry of the **Company** by an **Enforcement Authority**; or

(2)  an arrest or confinement of an **Insured Person** during the **Policy Period** to a specified residence or secure custodial premises operated by an **Enforcement Authority**, but only in connection with the business of the **Company** or an **Insured Person's** capacity as such or due to his/her status as such;

provided that **Interview** will not include: any document production or discovery in a legal proceeding; any request that is part of any routine or regularly scheduled oversight, compliance, audit, inspection or examination; or any request that is part of an employment-related investigation or **Claim**.  Any **Interview** as defined in (L)(1) above first received, or as defined in (L)(2) above, occurring, prior to the Inception Date of this Policy are not covered under this Policy.

(M)  "**Investigation Demand**" means an investigation by the **Company** to determine whether it is in its best interest to prosecute the allegations made by a security holder of the **Company** in a derivative demand or action.  An **Investigation Demand** shall be deemed first made upon the earlier of: receipt of such allegations by the **Company** or service of a civil complaint or similar proceeding setting forth such allegations.

(N)  "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

(1)  owns or controls at least thirty-three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the present right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

(2)  has the right, by written contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty-three percent (33%) of those persons described in (N)(1) above.

(O)  "**Loss**" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any **Insured** is legally obligated to pay and **Defense Expenses**, including that portion of any settlement which represents the claimant's attorneys' fees.  **Loss** will not include that portion which constitutes:

(1)  fines, penalties or taxes imposed by law; provided that **Loss** will specifically include:

(a)  civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); and

(b)  solely with respect to **Loss** to which Insuring Agreement (A) applies, fines, penalties or taxes that an **Insured Person** is obligated to pay if such fines, penalties or taxes are insurable by law and are imposed in connection with such **Insured Person's** service with an insolvent **Company;**

(2)  costs incurred by an **Insured** to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)     any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a **Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

(4)     any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

(5)     any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of any securities or assets of any person, group of persons, or entity;

(6)     the return of any amounts required to be paid by an **Insured Person** pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

NOTE:  With respect to judgments in which punitive, exemplary or multiplied damage are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive, exemplary or multiplied damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured**.

(P)     "**Non-Profit Entity**" means any not-for-profit entity or not-for-profit organization.

(Q)     "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(R)     "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.  **Policy Period** will include any Optional Extension Period, if applicable.

(S)     "**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

(1)     made against any **Insured** for any actual or alleged violation of any federal, state or local statute,  regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)     brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the **Company**; or

(b)     brought by a security holder of the **Company** with respect to such security holder's interest in securities of the **Company**; or

(2)     brought derivatively on behalf of the **Company** by a security holder of the **Company**.

Notwithstanding the foregoing, the term **Securities Claim** shall include an administrative or regulatory proceeding against, or a formal investigation of, the **Company**, but only if and only during the time that such formal investigation or proceeding is also maintained against an **Insured Person**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(T)  **"Subsidiary"** means any entity during any time in which the **Parent Company** holds directly or indirectly:

    (1)  more than fifty percent (50%) of the voting rights or issued share capital of such entity;

    (2)  between twenty percent (20%) and fifty percent (50%) of the voting rights or issued share capital, together with control of the management of such entity; or

    (3)  the right to appoint or remove a majority of the Board of Directors of such entity.

(U)  **"Wrongful Act"** means:

    (1)  any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such;

    (2)  solely with respect to a **Claim** as defined in Definition (C)(4) of the Policy, any other matter concerning an **Insured Person** solely by reason of his or her capacity as such or due to his or her status as such;

    (3)  solely with respect to Insuring Agreement (C) of the **Policy,** any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Company**; or

    (4)  any **Employment Practices Wrongful Act** by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such.

Solely with respect to determining whether a securities holder derivative lawsuit which names the **Company** as a defendant (including as a nominal defendant) is a **Securities Claim** against such **Company** for purposes of Insuring Agreement (C) of the Policy, any **Wrongful Act** as defined in subparagraph (U)(1) above will also be deemed to be a **Wrongful Act** of the **Company**; provided that this provision shall not be deemed to create coverage under this Policy for **Loss** from any **Investigation Demand** pursuant to Insuring Agreement (F) of the Policy.  Any such coverage shall only be available pursuant to Insuring Agreement (F) of the Policy.

## III.    EXCLUSIONS

(A)  No coverage shall be available under this Policy for that portion of any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)  for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any property including loss of use thereof; however, this Exclusion (A)(1) will not apply to: (a) any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of a **Claim** for an **Employment Practices Wrongful Act**;  (b) any **Securities Claim**; (c) for **Corporate Manslaughter Charges**; or (d) any **Claim** to the extent coverage is provided under Insuring Agreement, (A) of the Policy;

    (2)  for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation in connection with any pension, profit sharing or employee benefit program established and/or sponsored by the **Company** in whole or in part for the benefit of the directors, officers or employees of the **Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)    by, on behalf of, or at the direction of the **Company,** or any **Joint Venture** or **Non-Profit Entity** (but with respect to the **Joint Venture** or **Non-Profit Entity**, only against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Joint Venture** or **Non-Profit Entity**, or  as a person occupying an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated of the **Joint Venture**); however, this Exclusion (A)(3) will not apply to:

(a)    the extent a **Claim** is brought derivatively by a security holder of the **Company**, or by any **Joint Venture** or **Non-Profit Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured Person** unless such solicitation, assistance, participation or intervention is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute**,** or the **Company**, or any **Joint Venture** or **Non-Profit Entity**;

(b)    the extent a **Claim** or **Interview** is brought by the Bankruptcy Trustee or Examiner of the **Company**, or by  any **Joint Venture** or **Non-Profit Entity** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company, Joint Venture**, or **Non-Profit Entity**;

(c)    the extent a **Claim** is brought and maintained in a non-common law jurisdiction outside the United States of America, including its territories and possessions;

(d)    the extent a **Claim** or **Interview** is brought by a Creditors Committee of the **Company**, or any **Joint Venture** or **Non-Profit Entity** in the event the **Company**, **Joint Venture**, or **Non-Profit Entity** files for relief under Title 11 of the United States Code;

(e)    **Defense Expenses** covered under Insuring Agreement (A) or (D).

(B)    No coverage shall be available under this Policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

(1)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(3)    brought about or contributed to in fact by any:

(a)    deliberately fraudulent or deliberately criminal act or omission or any willful violation of any statute, rule or law by an **Insured**; or

(b)    profit or remuneration gained by an **Insured** to which such **Insured** is not legally entitled,

as determined by a final, non-appealable adjudication in the underlying action; however this Exclusion (B)(3) will not apply to: (i) allegations in a **Claim** asserted against an **Insured** under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the **Company's** securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933); or (ii) **Defense Expenses** incurred in connection with a

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**Claim** alleging violations of section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

No conduct of any **Insured** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS. Only the conduct of the chief executive officer and/or chief financial officer of the **Company** will be imputed to the **Company**.

## IV.    LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3(B) of the Declarations.

(B)    The amount set forth in ITEM 3(B) of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy whether any **Loss** is covered under one or more Insuring Agreements. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)    The amount set forth in Item 3(A) of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy resulting from all **Investigation Demands** first made during the **Policy Period**, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for the Policy as set forth in Item 3(B) of the Declarations.

(D)    With respect to the **Company's** indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to require indemnification to the **Insured Persons** to the fullest extent permitted by law.

(E)    No Retention will be applicable to **Loss**, including **Defense Expenses**, under Insuring Agreements, (A), (D) or (F).  In the event of financial insolvency of the **Company**, no Retention shall apply.

(F)    In the event the **Company** is obligated under the Policy to pay any Retention, the **Company** may satisfy such Retention from any source. As a precondition to such recognition of the erosion of the Retention from any source other than by payment by the **Company**, the **Company** shall provide the Insurer with written proof, to the Insurer's satisfaction, that payment of such Retention has been made.

(G)    If more than one retention is applicable to different portions of **Loss**, including **Defense Expenses**, the applicable Retention(s) will be applied separately to each portion of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

## V.    DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)    It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim**, **Interview** or **Investigation Demand** under this Policy.

(B)    No **Insured** may incur any **Defense Expenses** in connection with any **Claim, Interview** or **Investigation Demand**, or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably delayed or withheld; however, the **Insured** may settle a **Claim** without such consent, if the total amount of such settlement and **Defense Expenses** does not exceed fifty percent (50%) of the amount of the applicable Retention(s) for such **Claim**.

(C)    Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis, but no less so than quarterly, excess of the applicable Retention, before the disposition of the **Claim, Interview** or **Investigation Demand** for which this Policy provides coverage. As a condition of the advancement of **Defense Expenses**, each **Insured** agrees that if and to the extent it is determined that such **Defense Expenses** are not insured under this Policy, such **Defense Expenses** shall be repaid to the Insurer by the **Insureds**, severally according to their respective interests.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(D)     If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim, Interview** or **Investigation Demand** made against the **Insured** contains both covered and uncovered matters, or because a **Claim, Interview** or **Investigation Demand** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim, Interview** or **Investigation Demand** by, the **Insured** and others.

(E)     In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.    GENERAL CONDITIONS

(A)    **NOTICE**

(1)     As a condition precedent to any right to payment under this Policy with respect to any **Claim** or **Investigation Demand**, the **Insured** shall give written notice to the Insurer of each **Claim** or **Investigation Demand** as soon as practicable after it is first made, including but not limited to written notice as soon as practicable of each **Claim** or **Investigation Demand** deemed to constitute a single **Claim** or **Investigation Demand** pursuant to Section VI (B) below.  Such notice shall be provided as soon as practicable after the risk management or general counsel departments of the **Parent Company** first becomes aware of such **Claim** or **Investigation Demand**.  In the event that the **Insureds** fail to provide timely notice to the Insurer under this Section VI (A)(1), the Insurer shall not be entitled to deny coverage solely based on such untimely notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such untimely notice.

(2)     As a condition precedent to any right to payment under this Policy with respect to any **Interview**, the **Insured** may elect to give the Insurer written notice thereof during the **Policy Period** pursuant to Section VI (A)(4) below.

(3)     If, during the **Policy Period,** the **Insured** provides the Insurer with written notice of:

(a)     a specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**;

(b)     its receipt of a request to toll or waive a statute of limitations in connection with a **Wrongful Act**; or

(c)     an **Interview** first received during the **Policy Period**,

then any **Claim** or **Investigation Demand** subsequently made arising out of such **Wrongful Act**, request to toll or waive a statute of limitation or **Interview** will be treated as if it had been first made during the **Policy Period**, provided written notice of any subsequent **Claim** or **Investigation Demand** is provided to the Insurer as soon as practicable after such **Claim** or **Investigation Demand** is made.

(4)     All notices under Section VI (A)(1),(2) and (3) above must be sent by:

(a)     first class U.S. mail, overnight mail or the equivalent to the address set forth in ITEM 7 of the Declarations:  Attention Claim Department; or

(b)     electronic mail (email) to the address shown in ITEM 7 of the Declarations.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(B)    **INTERRELATED CLAIMS**

All **Claims, Investigation Demands, Interviews** or requests to toll or waive a statute of limitations, arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim, Investigation Demand** or **Interview** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim, Investigation Demand**, or **Interview** is made or deemed to have been made pursuant to Section VI (A) above.

(C)    **OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES**

(1)    Subject to Section IV LIMIT OF LIABILITY INDEMNIFICATION AND RETENTIONS (F), all coverage under this Policy will be specifically excess of and will not contribute with any other valid and collectible management liability insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy, or a personal umbrella policy or personal directorship liability policy purchased by an **Insured Person**. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** and **Interviews** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of his or her service as such.

(D)    **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)    If during the **Policy Period** the **Company** acquires any entity by merger, consolidation or otherwise such that the entity becomes a **Subsidiary**, coverage shall be provided for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the assets or liabilities so acquired or so assumed as a result of such acquisition, exceed thirty-five percent (35%) of the total assets or liabilities, respectively, of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days or to the Expiration Date, whichever occurs first, for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond such period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity as described in (D)(1) and (2) above, there will be no coverage available to the **Company**, an **Insured Person**, or to the acquired entity under this Policy for **Claims** made against the **Company** , an **Insured Person**, or the acquired entity, for a **Wrongful Act** committed any time during which such entity, is not an **Insured**.

(4)    If any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(5)    If during the **Policy Period** there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)    coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control.**

(E)    **CANCELLATION AND RENEWAL OF COVERAGE**

(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured,** if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)    **OPTIONAL EXTENSION PERIOD**

(1)    If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** or any **Insured Person** shall be entitled, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** or **Investigation Demand** first made or deemed first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date. Any such **Claim** or **Investigation Demand** shall be deemed to have been made during the **Policy Period**.

(2)    As a condition precedent to the right to purchase the Optional Extension Period, the total premium for this Policy must have been paid in full. The right of the **Parent Company** or any **Insured Person** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** or **Insured Person** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** or **Insured Person** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims**, **Interviews** and **Investigation Demands** made during the **Policy Period**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)    **ASSISTANCE, COOPERATION AND SUBROGATION**

    (1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request in connection with any **Claim**, **Investigation Demand** or **Interview** that is reasonably likely to be covered under this Policy, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery against any party.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment of **Loss** to all of the **Insured's** rights of recovery; provided that the Insurer will be subrogated to any **Insured's** potential or actual rights of recovery against any **Insured Person** only in the event that Exclusion (B)(3) of the Policy is applicable to such **Insured Person** in connection with such **Loss**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in its name, and will provide all other assistance and cooperation which the Insurer may reasonably require. It is understood that the failure of any **Insured Person** to give the Insurer cooperation and information as required in this paragraph shall not impair the rights of the **Company**, or any other **Insured Person** under this Policy.

    (3)    In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limits of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery.  It is understood and agreed that the Insurer shall have no duty to seek such a recovery.

(H)    **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned and, subject to Section VI General Condition (G)(3), all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person**.  With respect to **Claims** made under Insuring Agreement (C) only, no knowledge or information possessed by any **Insured Person** other than a past or present chief executive officer or chief financial officer of the **Parent Company** will be imputed to the **Company**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

This Policy shall not be rescinded by the Insurer; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

(J)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

    (1)    No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy.

    (2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

    (3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(4)     Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement.

(K)     **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)     the payment of the premiums;

(2)     the receiving of any return premiums that may become due under this Policy;

(3)     the giving of all notices to the Insurer as provided herein; and

(4)     the receiving of all notices from the Insurer.

(L)     **PRIORITY OF PAYMENTS**

In the event of **Loss**, including **Defense Expenses**, payable under more than one of the Insuring Agreements of the Policy, then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such **Loss** as follows:

(1)     first, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Insured Persons** which the **Company** is not permitted nor required to pay on behalf of the **Insured Persons** as indemnification;

(2)     second, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Company** which the **Company** is permitted or required to pay on behalf of the **Insured Persons**; and

(3)     third, the Insurer shall make such other payments which the Insurer may be liable to make under Insuring Agreements (C) and/or (F) or otherwise.

(M)     **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of any of its obligations under this Policy.  In such event, including any liquidation or reorganization proceeding of the **Company**, then each **Insured** and the Insurer hereby agree not to oppose or object to any efforts by any **Insured Person** to obtain relief from any stay or injunction.

(N)     **ENTIRE AGREEMENT – WORLDWIDE COVERAGE**

(1)     The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application**, shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.  The coverage afforded by the Policy shall apply anywhere in the world.

(2)     If the **Parent Company** requests management or directors and officers liability policies for issuance to its foreign **Subsidiaries** in their own countries, the Insurer or a subsidiary or affiliate of XL Group plc shall provide a quote to the **Parent Company** for such policies; provided that the Insurer or a subsidiary or affiliate of XL Group plc can support or facilitate the issuance of the policies to such foreign **Subsidiaries** in their applicable foreign countries. Any coordination of coverage under such policies with coverage under this Policy shall be set forth in an endorsement attached to this Policy.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(O)    **CURRENCY**

All premiums, limits of liability, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than the United States of America, payment of covered **Loss** due under this Policy, subject to its terms, conditions and limitations, will be made either in such other currency (at the option of the Insurer and with the agreement of the **Parent Company**), or, in the United States of America dollars at the rate of exchange most recently published in The Wall Street Journal on the date of the Insurer's obligation to pay such **Loss** is established.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

# COUNTERSIGNATURE ENDORSEMENT

Policy Number: ELU190927-23

Company:  XL Specialty Insurance Company

Named Insured:   Shiftpixy, Inc.

| State | Premium |
|-------|---------|
| FL | $380,000.00 |

The signature shown on this endorsement complies with the countersignature laws and regulations of the State shown.

Date of Countersignature      June 27, 2023

(month, day and year)

Countersigned by: *Kimberly D. Rigoroso*
Kimberly D. Rigoroso

Licensed Producer

BR 72 27 03 15

**Endorsement No.: 1**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU190927-23**

**Effective: June 30, 2023**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# FLORIDA AMENDATORY ENDORSEMENT

In consideration of the premium charged:

1.  Section **II**. **DEFINITIONS** (O) **LOSS** is amended by the addition of the following:

    In applying the foregoing, punitive damages are not insurable in Florida except as to vicarious liability.

2.  Section **VI**. **GENERAL CONDITIONS** (E) **CANCELLATION AND RENEWAL OF COVERAGE** paragraph (1) is deleted and replaced as follows:

    (1)   Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. The customary short rate return premium will be calculated by multiplying the pro rata unearned premium by ninety percent (90%). Return or tender of the unearned premium is not a condition of cancellation.

3.  Section **VI**. **GENERAL CONDITIONS** (I) **REPRESENTATION CLAUSE** is deleted in its entirety and replaced as follows:

    (I)    **REPRESENTATION CLAUSE**

        The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior **Application** submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person**.  With respect to **Claims** made under Insuring Agreement (C) only, no knowledge or information possessed by any **Insured Person** other than a past or present chief executive officer or chief financial officer of the **Parent Company** will be imputed to the **Company**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy may be void with respect to any **Insured** who knew of such untruth.

        This Policy shall not be rescinded by the Insurer; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

BR 80 507 10 20

| | |
|---|---|
| Endorsement No.: 2 | Effective: June 30, 2023 |
| Named Insured: Shiftpixy, Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU190927-23 | Insurer: XL Specialty Insurance Company |

Policy Form: **EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# DELETE INSURING AGREEMENTS (B) TO (F) AND SPECIFIED INSURED PERSONS ENDORSEMENT

In consideration of the premium charged:

(1)     Section I Insuring Agreement (B) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (B) are deleted.

(2)     Section I Insuring Agreement (C) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (C) are deleted.

(3)     Section I Insuring Agreement (D) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (D) are deleted.

(4)     Section I Insuring Agreement (E) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (E) are deleted.

(5)     Section I Insuring Agreement (F) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (F) are deleted.

(6)     The term "Insured," as defined in Section II Definitions (I) of the Policy, is amended to read in its entirety as follows:

"(I)     'Insured' means the Insured Persons."

(7)     Section II Definitions (L) of the Policy is deleted in its entirety, and all references in the Policy to "Interview" are deleted.

(8)     Section II Definitions (M) of the Policy is deleted in its entirety, and all references in the Policy to "Investigation Demand" are deleted.

(9)     The term "Securities Claim," as defined in Section II Definitions (S) of the Policy, is amended to read in its entirety as follows:

"(S)     'Securities Claim' means a Claim:

(1)     made against any Insured Person for any actual or alleged violation of any federal, state or local statute, regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)     brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the Company; or

(b)     brought by a security holder of the Company with respect to such security holder's interest in securities of the Company; or

(2)     brought derivatively on behalf of the Company by a security holder of the Company."

© 2020 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

(10)    The term "Wrongful Act," as defined Section II Definitions (U) of the Policy, is amended to read in its entirety as follows:

"(U)    'Wrongful Act' means:

(1)    any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an Insured Person while acting in his or her capacity as such or due to his or her status as such;

(2)    solely with respect to a Claim as defined in Definition (C)(4) of the Policy, any other matter concerning an Insured Person solely by reason of his or her capacity as such or due to his or her status as such; or

(3)    any Employment Practices Wrongful Act by an Insured Person while acting in his or her capacity as such or due to his or her status as such."

(11)    Section IV Limit of Liability, Indemnification and Retentions (A) of the Policy is amended to read in its entirety as follows:

"(A)    The Insurer shall pay the amount of Loss in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3 of the Declarations."

(12)    Section IV Limit of Liability, Indemnification and Retentions (B) of the Policy is amended to read in its entirety as follows:

"(B)    The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy, and payment of Loss, including Defense Expenses, by the Insurer shall reduce the Limit of Liability."

(13)    Section IV Limit of Liability, Indemnification and Retentions (C) of the Policy is deleted in its entirety.

(14)    Section IV Limit of Liability, Indemnification and Retentions (F) of the Policy is deleted in its entirety.

(15)    Section IV Limit of Liability, Indemnification and Retentions (G) of the Policy is deleted in its entirety.

(16)    Section V Defense, Settlement and Allocation of Loss (D) of the Policy is amended to read in its entirety as follows:

"(D)    If both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim made against an Insured contains both covered and uncovered matters, or because a Claim is made against both the Insured and others not insured under this Policy, the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of Loss between that portion of Loss that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the Insured and the Insurer agree that in determining a fair and appropriate allocation of Loss, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the Claim, by the Insured and others."

(17)    Section VI General Condition (L) of the Policy is deleted in its entirety.

(18)    Item 3. of the Declarations is amended to read in its entirety as follows:

"Item 3. Limit of Liability:
$5,000,000    Maximum Aggregate Limit of Liability each Policy Period (including Defense Expenses) for all Loss from all Claims"

(19)    Item 4. of the Declarations is amended to read in its entirety as follows:

© 2020 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

"Item 4. Retentions:

$0      each Insured Person under INSURING AGREEMENT I (A)"

All other terms, conditions and limitations of this Policy shall remain unchanged.

*© 2020 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.*

BR 80 454 08 19

**Endorsement No.: 3**                          **Effective: June 30, 2023**
**Named Insured: Shiftpixy, Inc.**              **12:01 A.M. Standard Time**
**Policy No.: ELU190927-23**                    **Insurer: XL Specialty Insurance Company**
**Policy Form: Executive and Corporate Securities Liability**

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the term "Loss," as defined in Section II Definitions of the Policy, shall not include any pre-judgment and post-judgment interest or other amounts (including, but not limited to, punitive, exemplary or multiplied damages) awarded in connection with all or any part of a judgment which is not covered under this Policy. The Policy, including any and all Endorsements, shall be deemed amended as necessary to affect the intent and purpose of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2019 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 91  02 16

Endorsement No.: 4                              Effective: June 30, 2023
Named Insured: Shiftpixy, Inc.                  12:01 A.M. Standard Time
Policy No.: ELU190927-23                        Insurer: XL Specialty Insurance Company

# REFUSAL/FAILURE/DENIAL TO INDEMNIFY ENDORSEMENT

In consideration of the premium charged:

(1)     In the event that an Insured Person requests that the Insurer pay covered Loss pursuant to Insuring
        Agreement (A), or (D) that the Company has wrongfully refused, denied to, or failed within sixty (60) days
        of such request to, indemnify, advance or pay on behalf of such Insured Person that the Company is
        permitted or required to pay, and the amount of such covered Loss is within the applicable Retention set
        forth in Item 4 of the Declarations of this Policy applicable to such Claim or Interview, then the Insurer
        shall advance such amounts on behalf of the Insured Person until either: (i) a Company, Non-Profit Entity
        or Joint Venture has agreed to make such payments; or (ii) the Retention has been satisfied.  In no event
        shall any such advancement by the Insurer relieve any Company, Non-Profit Entity or Joint Venture of
        any duty it may have to provide advancement, payment or indemnification to any Insured Person.  Any
        payment or advancement by the Insurer within an applicable Retention shall apply towards the exhaustion
        of the Limit of Liability.

(2)     If the Insurer pays under this Policy any indemnification, advancement or payment owed to any Insured
        Person by any Company, Non-Profit Entity or Joint Venture within an applicable Retention, then that
        Company, Non-Profit Entity or Joint Venture shall reimburse the Insurer for such amounts, and such
        amounts shall become immediately due and payable as a direct obligation of the Company, Non-Profit
        Entity or Joint Venture to the Insurer.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 51 08 15

**Endorsement No.: 5**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU190927-23**

**Effective: June 30, 2023**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF WRONGFUL ACT ENDORSEMENT

In consideration of the premium charged, the term "Wrongful Act," as defined in Section II Definition (U)(1) of the Policy will include any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person while acting in his or her capacity as a Controlling Person.

For the purposes of this endorsement, a "Controlling Person" means an Insured Person incurring liability pursuant to the Securities Act of 1933, Section 15. Liability of Controlling Persons, and pursuant to the Securities Exchange Act of 1934, Section 20. Liabilities of Controlling Persons, and/or any similar federal, state or local (whether statutory or common law), rule or regulation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

**BR 80 39 06 15**

| | |
|---|---|
| **Endorsement No.: 6** | **Effective: June 30, 2023** |
| **Named Insured: Shiftpixy, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU190927-23** | **Insurer: XL Specialty Insurance Company** |

# AMEND DEFINITION OF WRONGFUL ACT ENDORSEMENT

In consideration of the premium charged, the term "Wrongful Act," as defined in Section II Definition (U)(1) of the Policy will include any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person while acting in his or her capacity as a Selling Shareholder.

For the purposes of this endorsement, a "Selling Shareholder" means an Insured Person incurring liability pursuant to the Securities Act of 1933, Section 12(2), Civil Liabilities arising in connection with Prospectuses and Communications, and/or any similar federal, state or local (whether statutory or common law), rule or regulation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

BR 83 56 08 16

**Endorsement No.: 7**                              **Effective: June 30, 2023**
**Named Insured: Shiftpixy, Inc.**                  **12:01 A.M. Standard Time**
**Policy No.: ELU190927-23**                        **Insurer: XL Specialty Insurance Company**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# AMEND EXCLUSION (B)(2) ENDORSEMENT

In consideration of the premium charged, Section III Exclusion (B)(2) of the Policy is amended to read in its entirety as follows:

"(2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this Policy, was the subject of any notice given and accepted under any other Management Liability policy, Directors and Officers liability policy or similar policy of which this Policy is a renewal;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BRX 80 38 03 17

Endorsement No.: 8                              Effective: June 30, 2023
Named Insured: Shiftpixy, Inc.                  12:01 A.M. Standard Time
Policy No.: ELU190927-23                         Insurer: XL Specialty Insurance Company
Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, Section II Definition (O) of the Policy is amended to read in its entirety as follows:

(O)   "Loss" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any Insured is legally obligated to pay and Defense Expenses, including that portion of any settlement which represents the claimant's attorneys' fees. Other than Defense Expenses, Loss will not include that portion which constitutes:

    (1)   fines, penalties or taxes imposed by law; provided that Loss will specifically include:

        (a)   civil penalties assessed against any Insured Person pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a));

        (b)   any other fines or penalties to the extent insurable under the law pursuant to which this Policy is construed; and

        (b)   solely with respect to Loss to which Insuring Agreement (A) applies, taxes that an Insured Person is obligated to pay if such taxes are insurable by law and are imposed in connection with such Insured Person's service with an insolvent Company;

    (2)   costs incurred by an Insured to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

    (3)   any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a Claim arising from an initial or subsequent public offering of the Company's securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

    (4)   any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

    (5)   any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the Company in connection with its purchase of any securities or assets of any person, group of persons, or entity;

    (6)   the return of any amounts required to be paid by an Insured Person pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

NOTE:  With respect to judgments in which punitive, exemplary or multiplied damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the Insured, punitive, exemplary or multiplied damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Page 1 of 1

BRX 80 38 03 17
© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 84  12 15

**Endorsement No.: 9**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU190927-23**

**Effective: June 30, 2023**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# BOOKS & RECORDS REQUEST ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Interview," as defined in Section II Definition (L) of the Policy, shall include any Books & Records Request received by an Insured Person during the Policy Period or, if applicable, the Optional Extension Period.

(2)     Solely for the purposes of this endorsement, the term "Books & Records Request" means a written request by or on behalf of a shareholder of the Company upon the Board of Directors of the Company seeking document production in connection with such shareholder's review of the Company's business activities.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 253 03 17

| | |
|---|---|
| **Endorsement No.: 10** | **Effective: June 30, 2023** |
| **Named Insured: Shiftpixy, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU190927-23** | **Insurer: XL Specialty Insurance Company** |
| **Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY** | |

# AMEND CLAIM DEFINITION ENDORSEMENT

In consideration of the premium charged, Section II Definition (C) of the Policy is amended to read in its entirety as follows:

(C)    "Claim" means:

   (1)    any written demand (other than an Investigation Demand) received by the Insured for:

        (a)    monetary or non-monetary relief, including injunctive relief; or

        (b)    arbitration or  mediation;

   (2)    any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)    service of a complaint or similar pleading;

        (b)    return of an indictment, information, notice of charges or similar document; or

        (c)    an official written request for extradition of any Insured Person or the execution of a warrant for the arrest of any Insured Person where such execution is an element of extradition;

   (3)    any investigation of an Insured Person commenced by a written statement from an Enforcement Authority identifying such Insured Person as the subject of an investigation, including any target letter, Wells Notice or similar document;

   (4)    any subpoena served upon an Insured Person for testimony or documents in connection with a formal or informal investigation of the Company by any Enforcement Authority (regardless whether such subpoena assert the commission of a Wrongful Act by such Insured Person or Company); and

   (5) any Corporate Manslaughter Charge.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

# EXHIBIT C

INSURANCE POLICY NO. ELU183856-22

| Policy Number: | ELU183856-22 | **XL Specialty Insurance Company** |
|---|---|---|
| Renewal of Number | ELU176178-21 | Members of the XL America Companies |

---

> ### EXECUTIVE AND CORPORATE SECURITIES
> ### LIABILITY INSURANCE POLICY DECLARATIONS

**Regulatory Office**
505 Eagleview Blvd. Suite 100
Dept: Regulatory
Exton, PA 19341-1120
Telephone 800-688-1840

**Executive Offices**
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636
**Executive Offices**

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

---

**Item 1.  Name and Mailing Address of Parent Company:**

Shiftpixy, Inc.
1 Venture
Irvine, CA  92612

**Item 2.  Policy Period:**    Inception Date:    June 30, 2022       Expiration Date:    June 30, 2023

**At 12:01AM Standard Time at your Mailing Address Shown Above**

---

**Item 3.  Limit of Liability:**

(A) N/A    Maximum Aggregate Sublimit of Liability each **Policy Period** for all **Investigation Demands**

(B) $5,000,000    Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Loss** from all **Claims**, **Investigation Demands** and **Interviews**

---

**Item 4.  Retentions:**

| | |
|---|---|
| $0 | each **Insured Person** under INSURING AGREEMENT I (A) or (D) |
| N/A | each **Claim**, other than a **Securities Claim**, under INSURING AGREEMENT I (B) or (E) |
| N/A | each **Securities Claim** under INSURING AGREEMENT I (B) or (C) |
| $0 | each **Investigation Demand** under INSURING AGREEMENT I (F) |

---

**Item 5.  Optional Extension Period:**

Length of Optional Extension Period:   One Year after the end of the **Policy Period**, if elected.

Premium for Optional Extension Period:    $760,000.00

---

**Item 6.  Pending and Prior Litigation Date:**    June 30, 2021

---

**Item 7.  Notices required to be given to the Insurer must be addressed to:**

XL Professional Insurance
100 Constitution Plaza, 17th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636 or proclaimnewnotices@axaxl.com

---

**Item 8.  Premium:**

Taxes, Surcharges or Fees:    $0.00
Total Policy Premium:    $380,000.00

---

**Item 9.  Policy Forms and Endorsements Attached at Issuance:**

BR 71 00 09 14   BR 72 00 11 14   BR 80 507 10 20   BR 80 454 08 19   BR 80 91 02 16   BR 80 51 08 15
BR 80 39 06 15   BR 83 56 08 16   BRX 80 38 03 17   BR 80 84 12 15   BR 80 253 03 17

---

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE POLICY DECLARATIONS**

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

# IN WITNESS

## XL SPECIALTY INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

_____
Joseph Tocco
President

_____
Toni Ann Perkins
Secretary

LAD 400 0915 XLS
© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM**
**INSURANCE COVERAGE**

Coverage for acts of terrorism is included in your policy. You are hereby notified that the Terrorism Risk Insurance Act, as amended in 2019, defines an act of terrorism in  Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States —to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is $waived, and does not include any charges for the portion of losses covered by the United States government under the Act.

PN161 12 20 T

© 2020 X.L. America, Inc.
Includes copyrighted material of National Association of Insurance Commissioners, with its permission.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 0519

©2019 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## NOTICE TO POLICYHOLDERS

**PRIVACY POLICY**

The AXA XL insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality.  For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies.  For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way.  In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us.  Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products.  We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you.  Accordingly, we promise that:

1.  We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2.  We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3.  We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4.  We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5.  We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6.  We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7.  We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8.  We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services.  The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you.  The information we collect will vary with the type of insurance you seek;

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 0119                                                                                                        Page 3 of 3

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**FRAUD NOTICE**

| | |
|---|---|
| **Alabama** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. |
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **California** | **General: All applications for commercial insurance, other than liability insurance:** Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.

**All applications for liability insurance and all claim forms:** For your protection California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance that such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |

© 2022 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING**: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.<br><br>**WARNING: All Workers Compensation Insurance**:<br>Any person or entity who makes any material false statement or representation, who willfully and knowingly omits or conceals any material information, or who employs any device, scheme, or artifice, or who aids and abets any person for the purpose of:<br>1. obtaining any benefit or payment,<br>2. increasing any claim for benefit or payment, or<br>3. obtaining workers' compensation coverage under the Administrative Workers' Compensation Act, shall be guilty of a felony punishable pursuant to Section 1663 of Title 21 of the Oklahoma Statutes. |

© 2022 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

| | |
|---|---|
| **Pennsylvania** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2022 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

**IMPORTANT INFORMATION TO POLICYHOLDERS - CALIFORNIA**

In the event you need to contact someone about this Policy for any reason please contact your agent.  If you have additional questions, you may contact the insurance company issuing this Policy at the following address and telephone number:

> **AXA XL**
> **Seaview House**
> **70 Seaview Avenue**
> **Stamford, CT  06902-6040**
> **1-800-622-7311**

If you have a problem with your insurance company, its agent or representative that has not been resolved to your satisfaction, please call or write to the Department of Insurance.

> **Department of Consumer Affairs**
> **Consumer Information Division**
> **1625 North Market Blvd., Suite N 112**
> **Sacramento, CA  95834**
>
> **Internet Website: www.dca.ca.gov**
>
> **1-800-952-5210**
> **1-800-326-2297 (TDD Number)**
> **916-445-1254 (If calling from within the Sacramento area)**
> **916-928-1227 (TDD Number if calling from within the Sacramento area)**

Written correspondence is preferable so that a record of your inquiry can be maintained.  When contacting your agent, company or the Bureau of Insurance, have your Policy Number available.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE COVERAGE FORM**

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the "**Insurer**"), including the **Application**, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the **Insured Persons** and the **Company** agree as follows:

## I.    INSURING AGREEMENTS

(A)    The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The Insurer shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification.

(C)    The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act.**

(D)    The Insurer shall pay on behalf of the **Insured Persons Defense Expenses** resulting from an **Interview**, except for **Defense Expenses** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(E)    The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Insured Persons** resulting from an **Interview** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** such **Defense Expenses**.

(F)    The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Company** resulting from any **Investigation Demand** first made during the **Policy Period**.

## II.    DEFINITIONS

(A)    "**Application**" means:

(1)    any application, including attachments thereto, or any written information or representation, provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting of this Policy; and

(2)    any publicly available document filed by the **Company** with the U.S. Securities and Exchange Commission or any state, local or foreign equivalent during the twelve (12) months preceding this Policy's Inception Date.

(B)    "**Change In Control**" means:

(1)    the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity; or

(2)    any person, entity or an affiliated group of persons or entities acting together,  acquire (a) interest representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of the majority of the directors, management committee members or members of the board of managers of the **Parent Company**, as applicable to its organization, or (b) such rights pursuant to written contract or the by-laws, charter, operating agreement or similar document of the **Parent Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(C)  "**Claim**" means:

    (1)  any written demand (other than an **Investigation Demand**) for:

        (a)  monetary or non-monetary relief, including injunctive relief; or

        (b)  arbitration,  mediation or other alternative dispute resolution proceeding;

    (2)  any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)  service of a complaint or similar pleading;

        (b)  return of an indictment, information, notice of charges or similar document;

        (c)  an official written request for extradition of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of extradition**;**

    (3)  any investigation of an **Insured Person** commenced by a written statement from an **Enforcement Authority** identifying such **Insured Person** as the subject of an investigation, including any target letter, Wells Notice or similar document;

    (4)  any subpoena served upon an **Insured Person** for testimony or documents in connection with a formal or informal investigation of the **Company** by any **Enforcement Authority**; and

    (5)  any **Corporate Manslaughter Charge**.

(D)  "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D). The term **Company** shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction.

(E)  "**Corporate Manslaughter Charge**" means a formal criminal proceeding commenced in the United Kingdom against an **Insured Person** of the **Company** domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**.

(F)  "**Defense Expenses**" means reasonable and necessary legal fees, expenses and other costs (including experts' fees):

    (1)  incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim, Investigation Demand** or **Interview**, including any preparation for such an **Interview**;

    (2)  incurred due to the arrest and detainment or incarceration of any **Insured Person** in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**;

    (3)  incurred in connection with any **Claim** under section 304 of the Sarbanes-Oxley Act of 2002 or imposed pursuant to section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; or

    (4)  incurred in the defense of any **Corporate Manslaughter Charge**;

**Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)    "**Employment Practices Wrongful Act**" means any actual or alleged:

    (1)    wrongful termination of employment whether actual or constructive;

    (2)    employment discrimination of any kind, including violation of any federal, state or local law involving employment or discrimination in employment, which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

    (3)    sexual or other harassment in the workplace; or

    (4)    wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, refusal to hire, negligent hiring, or negligent supervision.

(H)    "**Enforcement Authority**" means any federal, state, local or foreign law enforcement or governmental regulatory authority, including the United States Departments of Justice and Labor, Securities and Exchange Commission, attorneys general, or the enforcement unit of any securities exchange or similar self-regulatory organization.

(I)    "**Insured**" means the **Insured Persons** and the **Company**.

(J)    "**Insured Person**" means:

    (1)    any past, present or future natural person director or officer, or member or manager of the board of managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    (2)    any past, present or future natural person employee of the **Company** (other than an individual described in (J)(1) above) to the extent any **Claim** is: (a) a **Securities Claim**, or (b) made and maintained against both such employee and an **Insured Person** as defined in (J)(1) above;

    (3)    an individual identified in (J)(1) above who, with the consent of the **Company**, is or was serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

    (4)    any individual identified in (J)(1) above who, with the consent of the **Company** is or was serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

In addition:

In the event of the death, incapacity or bankruptcy of any individual identified above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

The coverage otherwise available under this Policy to any **Insured Person** will be extended to such **Insured Person's** lawful spouse or domestic partner, but only to the extent such spouse or domestic partner is a party to any **Claim** solely in his or her capacity as a spouse or domestic partner of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner.

(K)    "**Interrelated Wrongful Acts**" means any **Wrongful Acts**, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(L)    "**Interview**" means:

    (1)    a written request first received by an **Insured Person** during the **Policy Period** for a voluntary interview, meeting or sworn statement by:

        (a)    any **Enforcement Authority**; or

        (b)    the **Company** in connection with an **Investigation Demand** or an investigation or other inquiry of the **Company** by an **Enforcement Authority**; or

    (2)    an arrest or confinement of an **Insured Person** during the **Policy Period** to a specified residence or secure custodial premises operated by an **Enforcement Authority**, but only in connection with the business of the **Company** or an **Insured Person's** capacity as such or due to his/her status as such;

provided that **Interview** will not include: any document production or discovery in a legal proceeding; any request that is part of any routine or regularly scheduled oversight, compliance, audit, inspection or examination; or any request that is part of an employment-related investigation or **Claim**.  Any **Interview** as defined in (L)(1) above first received, or as defined in (L)(2) above, occurring, prior to the Inception Date of this Policy are not covered under this Policy.

(M)    "**Investigation Demand**" means an investigation by the **Company** to determine whether it is in its best interest to prosecute the allegations made by a security holder of the **Company** in a derivative demand or action.  An **Investigation Demand** shall be deemed first made upon the earlier of: receipt of such allegations by the **Company** or service of a civil complaint or similar proceeding setting forth such allegations.

(N)    "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

    (1)    owns or controls at least thirty-three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the present right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

    (2)    has the right, by written contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty-three percent (33%) of those persons described in (N)(1) above.

(O)    "**Loss**" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any **Insured** is legally obligated to pay and **Defense Expenses**, including that portion of any settlement which represents the claimant's attorneys' fees.  **Loss** will not include that portion which constitutes:

    (1)    fines, penalties or taxes imposed by law; provided that **Loss** will specifically include:

        (a)    civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); and

        (b)    solely with respect to **Loss** to which Insuring Agreement (A) applies, fines, penalties or taxes that an **Insured Person** is obligated to pay if such fines, penalties or taxes are insurable by law and are imposed in connection with such **Insured Person's** service with an insolvent **Company;**

    (2)    costs incurred by an **Insured** to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)     any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a **Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

(4)     any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

(5)     any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of any securities or assets of any person, group of persons, or entity;

(6)     the return of any amounts required to be paid by an **Insured Person** pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

NOTE:   With respect to judgments in which punitive, exemplary or multiplied damage are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive, exemplary or multiplied damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured**.

(P)     "**Non-Profit Entity**" means any not-for-profit entity or not-for-profit organization.

(Q)     "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(R)     "**Policy Period"** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.  **Policy Period** will include any Optional Extension Period, if applicable.

(S)     "**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

(1)     made against any **Insured** for any actual or alleged violation of any federal, state or local statute,  regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)     brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the **Company**; or

(b)     brought by a security holder of the **Company** with respect to such security holder's interest in securities of the **Company**; or

(2)     brought derivatively on behalf of the **Company** by a security holder of the **Company**.

Notwithstanding the foregoing, the term **Securities Claim** shall include an administrative or regulatory proceeding against, or a formal investigation of, the **Company**, but only if and only during the time that such formal investigation or proceeding is also maintained against an **Insured Person**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(T)     **"Subsidiary"** means any entity during any time in which the **Parent Company** holds directly or indirectly:

    (1)     more than fifty percent (50%) of the voting rights or issued share capital of such entity;

    (2)     between twenty percent (20%) and fifty percent (50%) of the voting rights or issued share capital, together with control of the management of such entity; or

    (3)     the right to appoint or remove a majority of the Board of Directors of such entity.

(U)     **"Wrongful Act"** means:

    (1)     any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such;

    (2)     solely with respect to a **Claim** as defined in Definition (C)(4) of the Policy, any other matter concerning an **Insured Person** solely by reason of his or her capacity as such or due to his or her status as such;

    (3)     solely with respect to Insuring Agreement (C) of the **Policy,** any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Company**; or

    (4)     any **Employment Practices Wrongful Act** by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such.

Solely with respect to determining whether a securities holder derivative lawsuit which names the **Company** as a defendant (including as a nominal defendant) is a **Securities Claim** against such **Company** for purposes of Insuring Agreement (C) of the Policy, any **Wrongful Act** as defined in subparagraph (U)(1) above will also be deemed to be a **Wrongful Act** of the **Company**; provided that this provision shall not be deemed to create coverage under this Policy for **Loss** from any **Investigation Demand** pursuant to Insuring Agreement (F) of the Policy.  Any such coverage shall only be available pursuant to Insuring Agreement (F) of the Policy.

## III.     EXCLUSIONS

(A)     No coverage shall be available under this Policy for that portion of any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)     for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any property including loss of use thereof; however, this Exclusion (A)(1) will not apply to: (a) any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of a **Claim** for an **Employment Practices Wrongful Act**;  (b) any **Securities Claim**; (c) for **Corporate Manslaughter Charges**; or (d) any **Claim** to the extent coverage is provided under Insuring Agreement, (A) of the Policy;

    (2)     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation in connection with any pension, profit sharing or employee benefit program established and/or sponsored by the **Company** in whole or in part for the benefit of the directors, officers or employees of the **Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)    by, on behalf of, or at the direction of the **Company,** or any **Joint Venture** or **Non-Profit Entity** (but with respect to the **Joint Venture** or **Non-Profit Entity**, only against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Joint Venture** or **Non-Profit Entity**, or  as a person occupying an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated of the **Joint Venture**); however, this Exclusion (A)(3) will not apply to:

(a)    the extent a **Claim** is brought derivatively by a security holder of the **Company**, or by any **Joint Venture** or **Non-Profit Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured Person** unless such solicitation, assistance, participation or intervention is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute**,** or the **Company**, or any **Joint Venture** or **Non-Profit Entity**;

(b)    the extent a **Claim** or **Interview** is brought by the Bankruptcy Trustee or Examiner of the **Company**, or by  any **Joint Venture** or **Non-Profit Entity** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company, Joint Venture**, or **Non-Profit Entity**;

(c)    the extent a **Claim** is brought and maintained in a non-common law jurisdiction outside the United States of America, including its territories and possessions;

(d)    the extent a **Claim** or **Interview** is brought by a Creditors Committee of the **Company**, or any **Joint Venture** or **Non-Profit Entity** in the event the **Company**, **Joint Venture**, or **Non-Profit Entity** files for relief under Title 11 of the United States Code;

(e)    **Defense Expenses** covered under Insuring Agreement (A) or (D).

(B)    No coverage shall be available under this Policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

(1)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(3)    brought about or contributed to in fact by any:

(a)    deliberately fraudulent or deliberately criminal act or omission or any willful violation of any statute, rule or law by an **Insured**; or

(b)    profit or remuneration gained by an **Insured** to which such **Insured** is not legally entitled,

as determined by a final, non-appealable adjudication in the underlying action; however this Exclusion (B)(3) will not apply to: (i) allegations in a **Claim** asserted against an **Insured** under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the **Company's** securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933); or (ii) **Defense Expenses** incurred in connection with a

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**Claim** alleging violations of section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

No conduct of any **Insured** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS. Only the conduct of the chief executive officer and/or chief financial officer of the **Company** will be imputed to the **Company**.

## IV.    LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3(B) of the Declarations.

(B)    The amount set forth in ITEM 3(B) of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy whether any **Loss** is covered under one or more Insuring Agreements. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)    The amount set forth in Item 3(A) of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy resulting from all **Investigation Demands** first made during the **Policy Period**, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for the Policy as set forth in Item 3(B) of the Declarations.

(D)    With respect to the **Company's** indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to require indemnification to the **Insured Persons** to the fullest extent permitted by law.

(E)    No Retention will be applicable to **Loss**, including **Defense Expenses**, under Insuring Agreements, (A), (D) or (F).  In the event of financial insolvency of the **Company**, no Retention shall apply.

(F)    In the event the **Company** is obligated under the Policy to pay any Retention, the **Company** may satisfy such Retention from any source. As a precondition to such recognition of the erosion of the Retention from any source other than by payment by the **Company**, the **Company** shall provide the Insurer with written proof, to the Insurer's satisfaction, that payment of such Retention has been made.

(G)    If more than one retention is applicable to different portions of **Loss**, including **Defense Expenses**, the applicable Retention(s) will be applied separately to each portion of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

## V.    DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)    It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim**, **Interview** or **Investigation Demand** under this Policy.

(B)    No **Insured** may incur any **Defense Expenses** in connection with any **Claim, Interview** or **Investigation Demand**, or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably delayed or withheld; however, the **Insured** may settle a **Claim** without such consent, if the total amount of such settlement and **Defense Expenses** does not exceed fifty percent (50%) of the amount of the applicable Retention(s) for such **Claim**.

(C)    Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis, but no less so than quarterly, excess of the applicable Retention, before the disposition of the **Claim, Interview** or **Investigation Demand** for which this Policy provides coverage. As a condition of the advancement of **Defense Expenses**, each **Insured** agrees that if and to the extent it is determined that such **Defense Expenses** are not insured under this Policy, such **Defense Expenses** shall be repaid to the Insurer by the **Insureds**, severally according to their respective interests.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(D)    If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim, Interview** or **Investigation Demand** made against the **Insured** contains both covered and uncovered matters, or because a **Claim, Interview** or **Investigation Demand** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim, Interview** or **Investigation Demand** by, the **Insured** and others.

(E)    In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.    GENERAL CONDITIONS

(A)    **NOTICE**

(1)    As a condition precedent to any right to payment under this Policy with respect to any **Claim** or **Investigation Demand**, the **Insured** shall give written notice to the Insurer of each **Claim** or **Investigation Demand** as soon as practicable after it is first made, including but not limited to written notice as soon as practicable of each **Claim** or **Investigation Demand** deemed to constitute a single **Claim** or **Investigation Demand** pursuant to Section VI (B) below.  Such notice shall be provided as soon as practicable after the risk management or general counsel departments of the **Parent Company** first becomes aware of such **Claim** or **Investigation Demand**.  In the event that the **Insureds** fail to provide timely notice to the Insurer under this Section VI (A)(1), the Insurer shall not be entitled to deny coverage solely based on such untimely notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such untimely notice.

(2)    As a condition precedent to any right to payment under this Policy with respect to any **Interview**, the **Insured** may elect to give the Insurer written notice thereof during the **Policy Period** pursuant to Section VI (A)(4) below.

(3)    If, during the **Policy Period,** the **Insured** provides the Insurer with written notice of:

(a)    a specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**;

(b)    its receipt of a request to toll or waive a statute of limitations in connection with a **Wrongful Act**; or

(c)    an **Interview** first received during the **Policy Period**,

then any **Claim** or **Investigation Demand** subsequently made arising out of such **Wrongful Act**, request to toll or waive a statute of limitation or **Interview** will be treated as if it had been first made during the **Policy Period**, provided written notice of any subsequent **Claim** or **Investigation Demand** is provided to the Insurer as soon as practicable after such **Claim** or **Investigation Demand** is made.

(4)    All notices under Section VI (A)(1),(2) and (3) above must be sent by:

(a)    first class U.S. mail, overnight mail or the equivalent to the address set forth in ITEM 7 of the Declarations:  Attention Claim Department; or

(b)    electronic mail (email) to the address shown in ITEM 7 of the Declarations.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(B)    **INTERRELATED CLAIMS**

All **Claims, Investigation Demands, Interviews** or requests to toll or waive a statute of limitations, arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim, Investigation Demand** or **Interview** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim, Investigation Demand**, or **Interview** is made or deemed to have been made pursuant to Section VI (A) above.

(C)    **OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES**

(1)    Subject to Section IV LIMIT OF LIABILITY INDEMNIFICATION AND RETENTIONS (F), all coverage under this Policy will be specifically excess of and will not contribute with any other valid and collectible management liability insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy, or a personal umbrella policy or personal directorship liability policy purchased by an **Insured Person**. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** and **Interviews** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of his or her service as such.

(D)    **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)    If during the **Policy Period** the **Company** acquires any entity by merger, consolidation or otherwise such that the entity becomes a **Subsidiary**, coverage shall be provided for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the assets or liabilities so acquired or so assumed as a result of such acquisition, exceed thirty-five percent (35%) of the total assets or liabilities, respectively, of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days or to the Expiration Date, whichever occurs first, for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond such period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity as described in (D)(1) and (2) above, there will be no coverage available to the **Company**, an **Insured Person**, or to the acquired entity under this Policy for **Claims** made against the **Company**, an **Insured Person**, or the acquired entity, for a **Wrongful Act** committed any time during which such entity, is not an **Insured**.

(4)    If any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(5)    If during the **Policy Period** there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)    coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control.**

(E)    **CANCELLATION AND RENEWAL OF COVERAGE**

(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured,** if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)    **OPTIONAL EXTENSION PERIOD**

(1)    If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** or any **Insured Person** shall be entitled, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** or **Investigation Demand** first made or deemed first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date. Any such **Claim** or **Investigation Demand** shall be deemed to have been made during the **Policy Period**.

(2)    As a condition precedent to the right to purchase the Optional Extension Period, the total premium for this Policy must have been paid in full. The right of the **Parent Company** or any **Insured Person** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** or **Insured Person** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** or **Insured Person** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims**, **Interviews** and **Investigation Demands** made during the **Policy Period**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)    **ASSISTANCE, COOPERATION AND SUBROGATION**

(1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request in connection with any **Claim**, **Investigation Demand** or **Interview** that is reasonably likely to be covered under this Policy, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery against any party.

(2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment of **Loss** to all of the **Insured's** rights of recovery; provided that the Insurer will be subrogated to any **Insured's** potential or actual rights of recovery against any **Insured Person** only in the event that Exclusion (B)(3) of the Policy is applicable to such **Insured Person** in connection with such **Loss**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in its name, and will provide all other assistance and cooperation which the Insurer may reasonably require. It is understood that the failure of any **Insured Person** to give the Insurer cooperation and information as required in this paragraph shall not impair the rights of the **Company**, or any other **Insured Person** under this Policy.

(3)    In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limits of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery.  It is understood and agreed that the Insurer shall have no duty to seek such a recovery.

(H)    **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned and, subject to Section VI General Condition (G)(3), all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person**.  With respect to **Claims** made under Insuring Agreement (C) only, no knowledge or information possessed by any **Insured Person** other than a past or present chief executive officer or chief financial officer of the **Parent Company** will be imputed to the **Company**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

This Policy shall not be rescinded by the Insurer; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

(J)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement.

(K)    **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)    the payment of the premiums;

(2)    the receiving of any return premiums that may become due under this Policy;

(3)    the giving of all notices to the Insurer as provided herein; and

(4)    the receiving of all notices from the Insurer.

(L)    **PRIORITY OF PAYMENTS**

In the event of **Loss**, including **Defense Expenses**, payable under more than one of the Insuring Agreements of the Policy, then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such **Loss** as follows:

(1)    first, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Insured Persons** which the **Company** is not permitted nor required to pay on behalf of the **Insured Persons** as indemnification;

(2)    second, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Company** which the **Company** is permitted or required to pay on behalf of the **Insured Persons**; and

(3)    third, the Insurer shall make such other payments which the Insurer may be liable to make under Insuring Agreements (C) and/or (F) or otherwise.

(M)    **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of any of its obligations under this Policy.  In such event, including any liquidation or reorganization proceeding of the **Company**, then each **Insured** and the Insurer hereby agree not to oppose or object to any efforts by any **Insured Person** to obtain relief from any stay or injunction.

(N)    **ENTIRE AGREEMENT – WORLDWIDE COVERAGE**

(1)    The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application**, shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.  The coverage afforded by the Policy shall apply anywhere in the world.

(2)    If the **Parent Company** requests management or directors and officers liability policies for issuance to its foreign **Subsidiaries** in their own countries, the Insurer or a subsidiary or affiliate of XL Group plc shall provide a quote to the **Parent Company** for such policies; provided that the Insurer or a subsidiary or affiliate of XL Group plc can support or facilitate the issuance of the policies to such foreign **Subsidiaries** in their applicable foreign countries. Any coordination of coverage under such policies with coverage under this Policy shall be set forth in an endorsement attached to this Policy.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(O)    **CURRENCY**

All premiums, limits of liability, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than the United States of America, payment of covered **Loss** due under this Policy, subject to its terms, conditions and limitations, will be made either in such other currency (at the option of the Insurer and with the agreement of the **Parent Company**), or, in the United States of America dollars at the rate of exchange most recently published in The Wall Street Journal on the date of the Insurer's obligation to pay such **Loss** is established.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**BR 72 00 11 14**

**Endorsement No.: 1**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# CALIFORNIA AMENDATORY ENDORSEMENT

In consideration of the premium charged:

1.      Section **II. DEFINITIONS** (O) **"Loss"** is amended by the addition of the following:

   In applying the foregoing, punitive damages are not insurable in California.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 507 10 20

| | |
|---|---|
| Endorsement No.: 2 | Effective: June 30, 2022 |
| Named Insured: Shiftpixy, Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU183856-22 | Insurer: XL Specialty Insurance Company |

**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# DELETE INSURING AGREEMENTS (B) TO (F) AND SPECIFIED INSURED PERSONS ENDORSEMENT

In consideration of the premium charged:

(1)     Section I Insuring Agreement (B) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (B) are deleted.

(2)     Section I Insuring Agreement (C) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (C) are deleted.

(3)     Section I Insuring Agreement (D) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (D) are deleted.

(4)     Section I Insuring Agreement (E) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (E) are deleted.

(5)     Section I Insuring Agreement (F) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (F) are deleted.

(6)     The term "Insured," as defined in Section II Definitions (I) of the Policy, is amended to read in its entirety as follows:

"(I)     'Insured' means the Insured Persons."

(7)     Section II Definitions (L) of the Policy is deleted in its entirety, and all references in the Policy to "Interview" are deleted.

(8)     Section II Definitions (M) of the Policy is deleted in its entirety, and all references in the Policy to "Investigation Demand" are deleted.

(9)     The term "Securities Claim," as defined in Section II Definitions (S) of the Policy, is amended to read in its entirety as follows:

"(S)     'Securities Claim' means a Claim:

(1)     made against any Insured Person for any actual or alleged violation of any federal, state or local statute, regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)     brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the Company; or

(b)     brought by a security holder of the Company with respect to such security holder's interest in securities of the Company; or

(2)     brought derivatively on behalf of the Company by a security holder of the Company."

© 2020 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

(10)    The term "Wrongful Act," as defined Section II Definitions (U) of the Policy, is amended to read in its entirety as follows:

"(U)    'Wrongful Act' means:

(1)    any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an Insured Person while acting in his or her capacity as such or due to his or her status as such;

(2)    solely with respect to a Claim as defined in Definition (C)(4) of the Policy, any other matter concerning an Insured Person solely by reason of his or her capacity as such or due to his or her status as such; or

(3)    any Employment Practices Wrongful Act by an Insured Person while acting in his or her capacity as such or due to his or her status as such."

(11)    Section IV Limit of Liability, Indemnification and Retentions (A) of the Policy is amended to read in its entirety as follows:

"(A)    The Insurer shall pay the amount of Loss in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3 of the Declarations."

(12)    Section IV Limit of Liability, Indemnification and Retentions (B) of the Policy is amended to read in its entirety as follows:

"(B)    The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy, and payment of Loss, including Defense Expenses, by the Insurer shall reduce the Limit of Liability."

(13)    Section IV Limit of Liability, Indemnification and Retentions (C) of the Policy is deleted in its entirety.

(14)    Section IV Limit of Liability, Indemnification and Retentions (F) of the Policy is deleted in its entirety.

(15)    Section IV Limit of Liability, Indemnification and Retentions (G) of the Policy is deleted in its entirety.

(16)    Section V Defense, Settlement and Allocation of Loss (D) of the Policy is amended to read in its entirety as follows:

"(D)    If both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim made against an Insured contains both covered and uncovered matters, or because a Claim is made against both the Insured and others not insured under this Policy, the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of Loss between that portion of Loss that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the Insured and the Insurer agree that in determining a fair and appropriate allocation of Loss, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the Claim, by the Insured and others."

(17)    Section VI General Condition (L) of the Policy is deleted in its entirety.

(18)    Item 3. of the Declarations is amended to read in its entirety as follows:

"Item 3. Limit of Liability:

$5,000,000    Maximum Aggregate Limit of Liability each Policy Period (including Defense Expenses) for all Loss from all Claims"

(19)    Item 4. of the Declarations is amended to read in its entirety as follows:

"Item 4. Retentions:

$0      each Insured Person under INSURING AGREEMENT I (A)"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2020 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 454 08 19

**Endorsement No.: 3**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the term "Loss," as defined in Section II Definitions of the Policy, shall not include any pre-judgment and post-judgment interest or other amounts (including, but not limited to, punitive, exemplary or multiplied damages) awarded in connection with all or any part of a judgment which is not covered under this Policy. The Policy, including any and all Endorsements, shall be deemed amended as necessary to affect the intent and purpose of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2019 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 91  02 16

**Endorsement No.: 4**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# REFUSAL/FAILURE/DENIAL TO INDEMNIFY ENDORSEMENT

In consideration of the premium charged:

(1)     In the event that an Insured Person requests that the Insurer pay covered Loss pursuant to Insuring Agreement (A), or (D) that the Company has wrongfully refused, denied to, or failed within sixty (60) days of such request to, indemnify, advance or pay on behalf of such Insured Person that the Company is permitted or required to pay, and the amount of such covered Loss is within the applicable Retention set forth in Item 4 of the Declarations of this Policy applicable to such Claim or Interview, then the Insurer shall advance such amounts on behalf of the Insured Person until either: (i) a Company, Non-Profit Entity or Joint Venture has agreed to make such payments; or (ii) the Retention has been satisfied.  In no event shall any such advancement by the Insurer relieve any Company, Non-Profit Entity or Joint Venture of any duty it may have to provide advancement, payment or indemnification to any Insured Person.  Any payment or advancement by the Insurer within an applicable Retention shall apply towards the exhaustion of the Limit of Liability.

(2)     If the Insurer pays under this Policy any indemnification, advancement or payment owed to any Insured Person by any Company, Non-Profit Entity or Joint Venture within an applicable Retention, then that Company, Non-Profit Entity or Joint Venture shall reimburse the Insurer for such amounts, and such amounts shall become immediately due and payable as a direct obligation of the Company, Non-Profit Entity or Joint Venture to the Insurer.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 51 08 15

**Endorsement No.: 5**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF WRONGFUL ACT ENDORSEMENT

In consideration of the premium charged, the term "Wrongful Act," as defined in Section II Definition (U)(1) of the Policy will include any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person while acting in his or her capacity as a Controlling Person.

For the purposes of this endorsement, a "Controlling Person" means an Insured Person incurring liability pursuant to the Securities Act of 1933, Section 15. Liability of Controlling Persons, and pursuant to the Securities Exchange Act of 1934, Section 20. Liabilities of Controlling Persons, and/or any similar federal, state or local (whether statutory or common law), rule or regulation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

BR 80 39 06 15

**Endorsement No.: 6**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF WRONGFUL ACT ENDORSEMENT

In consideration of the premium charged, the term "Wrongful Act," as defined in Section II Definition (U)(1) of the Policy will include any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person while acting in his or her capacity as a Selling Shareholder.

For the purposes of this endorsement, a "Selling Shareholder" means an Insured Person incurring liability pursuant to the Securities Act of 1933, Section 12(2), Civil Liabilities arising in connection with Prospectuses and Communications, and/or any similar federal, state or local (whether statutory or common law), rule or regulation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

BR 83 56 08 16

**Endorsement No.: 7**                          **Effective: June 30, 2022**
**Named Insured: Shiftpixy, Inc.**              **12:01 A.M. Standard Time**
**Policy No.: ELU183856-22**                    **Insurer: XL Specialty Insurance Company**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# AMEND EXCLUSION (B)(2) ENDORSEMENT

In consideration of the premium charged, Section III Exclusion (B)(2) of the Policy is amended to read in its entirety as follows:

"(2)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this Policy, was the subject of any notice given and accepted under any other Management Liability policy, Directors and Officers liability policy or similar policy of which this Policy is a renewal;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BRX 80 38 03 17

| | |
|---|---|
| Endorsement No.: 8 | Effective: June 30, 2022 |
| Named Insured: Shiftpixy, Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU183856-22 | Insurer: XL Specialty Insurance Company |

Policy Form: **EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, Section II Definition (O) of the Policy is amended to read in its entirety as follows:

(O)   "Loss" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any Insured is legally obligated to pay and Defense Expenses, including that portion of any settlement which represents the claimant's attorneys' fees. Other than Defense Expenses, Loss will not include that portion which constitutes:

   (1)   fines, penalties or taxes imposed by law; provided that Loss will specifically include:

      (a)   civil penalties assessed against any Insured Person pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a));

      (b)   any other fines or penalties to the extent insurable under the law pursuant to which this Policy is construed; and

      (b)   solely with respect to Loss to which Insuring Agreement (A) applies, taxes that an Insured Person is obligated to pay if such taxes are insurable by law and are imposed in connection with such Insured Person's service with an insolvent Company;

   (2)   costs incurred by an Insured to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

   (3)   any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a Claim arising from an initial or subsequent public offering of the Company's securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

   (4)   any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

   (5)   any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the Company in connection with its purchase of any securities or assets of any person, group of persons, or entity;

   (6)   the return of any amounts required to be paid by an Insured Person pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

   NOTE:  With respect to judgments in which punitive, exemplary or multiplied damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the Insured, punitive, exemplary or multiplied damages are

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 84  12 15

**Endorsement No.: 9**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# BOOKS & RECORDS REQUEST ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Interview," as defined in Section II Definition (L) of the Policy, shall include any Books & Records Request received by an Insured Person during the Policy Period or, if applicable, the Optional Extension Period.

(2)     Solely for the purposes of this endorsement, the term "Books & Records Request" means a written request by or on behalf of a shareholder of the Company upon the Board of Directors of the Company seeking document production in connection with such shareholder's review of the Company's business activities.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 253 03 17

**Endorsement No.: 10**
**Named Insured: Shiftpixy, Inc.**
**Policy No.: ELU183856-22**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

**Effective: June 30, 2022**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND CLAIM DEFINITION ENDORSEMENT

In consideration of the premium charged, Section II Definition (C) of the Policy is amended to read in its entirety as follows:

(C)     "Claim" means:

    (1)     any written demand (other than an Investigation Demand) received by the Insured for:

        (a)     monetary or non-monetary relief, including injunctive relief; or

        (b)     arbitration or  mediation;

    (2)     any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)     service of a complaint or similar pleading;

        (b)     return of an indictment, information, notice of charges or similar document; or

        (c)     an official written request for extradition of any Insured Person or the execution of a warrant for the arrest of any Insured Person where such execution is an element of extradition;

    (3)     any investigation of an Insured Person commenced by a written statement from an Enforcement Authority identifying such Insured Person as the subject of an investigation, including any target letter, Wells Notice or similar document;

    (4)     any subpoena served upon an Insured Person for testimony or documents in connection with a formal or informal investigation of the Company by any Enforcement Authority (regardless whether such subpoena assert the commission of a Wrongful Act by such Insured Person or Company); and

    (5) any Corporate Manslaughter Charge.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.