**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

*In re*

SHIFTPIXY, INC.[1],

        Debtors.         /

JACQUELINE CALDERIN, CHAPTER 7
TRUSTEE,

      Plaintiff,

vs.

G3 BUSINESS SERVICES, LLC

      Defendant.         /

Case No.: 24-21209-LMI

Chapter 7

Adv. Case No.: _____-_____

## COMPLAINT

Plaintiff, Jacqueline Calderin, not individually but solely in her capacity as the Chapter 7 Trustee (the Trustee" or "Plaintiff") for the jointly administered bankruptcy estates (the "Estates") of Shiftpixy, Inc., Shiftpixy Staffing, Inc., and ReThink Human Capital Management, Inc. (collectively, the "Debtors"), sues G3 Business Services, LLC (the "Defendant"). In support of this Complaint, the Plaintiff alleges as follows:

### NATURE OF ACTION, PARTIES, JURISDICTION AND VENUE

1. The Plaintiff sues the Defendant for breach of contract, for turnover, and unjust enrichment.

2. Plaintiff is the Chapter 7 Trustee of the Debtors' Estates.

---

[1] The Debtors are: (i) Shiftpixy, Inc.; (ii) Shiftpixy Staffing, Inc.; and (iii) ReThink Human Capital Management, Inc.

1



3. Debtor Shiftpixy, Inc. ("Shiftpixy") was a for-profit corporation incorporated in the State of Wyoming, with its principal office located in Miami-Dade County, Florida. ShiftPixy's core business is a human capital management platform that provides a full suite of personnel staffing services to its clients.

4. Debtor Shiftpixy Staffing, Inc. ("Shiftpixy Staffing") was a for-profit corporation incorporated in the State of Wyoming, with its principal office located in Miami-Dade County, Florida.

5. Debtor ReThink Human Capital Management, Inc. ("ReThink") (Shiftpixy, Shiftpixy Staffing and ReThink, collectively the "Debtors") was a for-profit corporation incorporated in the State of Wyoming, with its principal office located in Miami-Dade County, Florida.

6. Defendant is a New Jersey limited liability company.

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157(b) and 1334(b).

8. This is a core proceeding for which the Court is authorized to determine all matters regarding this case in accordance with 28 U.S.C. § 157(b)(2)(A), (E), (N) and (O).

9. This action arises under title 11 and arises in and is related to a case under title 11.

10. The Court has constitutional authority to enter a final judgment. To the extent any claim is determined to be non-core, the Plaintiff consents to entry of final orders by this Court.

11. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

12. All conditions precedent to the filing of this action have been performed, waived, satisfied, excused and/or have otherwise occurred.

2



## FACTUAL BACKGROUND

13.    On October 28, 2024, each of the Debtors initiated their respective bankruptcy cases[2] (the "Bankruptcy Cases") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

14.    On or about December 10, 2024, the Debtors and the Defendant entered into the *Asset Purchase Agreement* (the "APA"), which was subsequently amended on December 16, 2024, by the *First Amendment to Asset Purchase Agreement* (the "Amendment") (together, the "Contract"), whereby the Debtor agreed to sell substantially all of its assets to the Defendant.  A true and correct copy of the APA is attached hereto as **Exhibit A**, and a true and correct copy of the Amendment is attached hereto as **Exhibit B.**

15.    On December 17, 2024, the Court entered its *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Remaining Assets Free and Clear of All Encumbrances; (II) Approving the Assumption and Assignment of the Assumed Contracts; and (III) Granting Related Relief* (the "Sale Order") [Main Bankr. ECF No. 140], which, among other things, approved the Contract and the sale of substantially all of the Debtors' assets to the Defendant.

16.    Pursuant to the Contract, the Defendant agreed to purchase the following assets (the "Transferred Assets"):

    a.   Trademarks of the Debtors;

    b.   The domain ShiftPixy.com;

    c.   Patent for Shift Worker Platform, Patent No. US20180025309A1;

    d.   Debtors' social media accounts;

---

[2] *In re Shiftpixy, Inc.*, Case No.: 24-21209-LMI; *In re Shiftpixy Staffing, Inc.*, Case No.: 24-21212-LMI; *In re ReThink Human Capital Management, Inc.*, Case No. 24-21214-LMI.



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

e. Source code for the Debtors' proprietary software platform and mobile application;

f. Contracts with vendors for software platforms; and

g. Debtors' active client list; and

h. The $PIXY public shell.

17. The Debtors and the Defendant entered into the Amendment because a client of the Debtors, Bond No. 9, terminated its Master Service Agreement with the Debtors.

18. Pursuant to the Contract, the Defendants purchased the Transferred Assets for $1,850,000.00 (the "Purchase Price").

19. Pursuant to the Contract, the Defendant agreed to pay the Purchase Price in installments, with an $850,000.00 down payment due at closing, and the remaining $1,000,000.00 payable in 12 quarterly installments of $83,333.33, with the first installment due on or before March 31, 2025.

20. Pursuant to the Contract, in the event that Bond No. 9 rescinded its termination of its Master Service Agreement with the Debtors, and became a client of the Defendant, the installment payments would become immediately due.

21. Additionally, pursuant to the Contract, the Defendant assumed the following liabilities:

a. all Liabilities and obligations of Sellers arising out of or relating to the Assigned Contracts;

b. all Liabilities and obligations related to the Transferred Assets for the post-Closing Period; and

c. payment of all Cure Costs.

*See* APA, at § 1.3; Amendment, at § 4.1.

4



22.    The sale closed on December 18, 2024. *See* Main Bankr. ECF No. 152.

23.    Upon the closing of the sale, the Defendant was not ready to operate or service the former clients of the Debtors.

24.    Accordingly, the Debtors continued to operate post-closing for the benefit of the Defendant and to facilitate the transfer of assets to the Defendant.

25.    Pursuant to the Contract, all liabilities incurred by the Debtors related to the Transferred Assets, which were incurred post-closing of the sale, were assumed by, and obligations of the Defendant.

26.    On December 18, 2024, Ram Ajjarapu, the principal of the Defendant, reiterated this agreed upon contractual term, and stated "I agree to Isaac's suggestion that today onwards & going forward its our responsibility to assume all the bills that are assumed and required for our operations."  *See* email from Ram Ajjarapu to Chris Todd, Isaac Marcushamer and Jonathan Feldman, dated December 18, 2024, which is attached hereto as **Exhibit C.**

27.    Pursuant to these terms, the Debtors continued to operate their business during this transition period, substantially for the benefit of the Defendant.

28.    On January 31, 2025, the Court entered its *Order Granting Expedited Motion of the Debtors for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Upon the Closing of the Same* [ECF No. 179], which converted this case to Chapter 7.  Subsequently, the Plaintiff was appointed as Chapter 7 trustee.

29.    Following the closing of the sale and during this transition period, the Defendant used the Debtors', and subsequently the bankruptcy estate's Employer Identification Number, or EIN, to complete some of the services provided to Defendant's clients.

agentis
Legal Advocates & Advisors

**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

30.     On April 18, 2025, the Bankruptcy Court entered its *Order Granting Trustee's Expedited Motion (I) to Terminate All Operations; (II) to Establish Deadlines to Provide Accountings; (III) Enforce the Terms of the Asset Purchase Agreement; and (IN) for Other, Related Relief* ("Termination Order") [Main Bankr. ECF No. 250], which, among other things, required the Defendant to indemnify and hold harmless the Debtors, the Plaintiff and the bankruptcy estates for all claims and liabilities that might arise from the Defendant's use of the Debtors' EIN.  *See* Termination Order, at ¶ 2.

31.     Additionally, the Termination Order required the Plaintiff to "provide an accounting of expenses either paid for the benefit of the [Defendant], or resources expended for the benefit of the [Defendant] within seven (7) days of this Order.  The [Defendant] shall have seven (7) days to respond to the accounting in writing.  In the event that the Buyer disagrees with any portion of the accounting provided by the Trustee, the Buyer shall provide its response in writing regarding each line item on the accounting for which it disagrees." *Id.*, at ¶ 4.

32.     The deadline for the Plaintiff to provide the accounting to the Defendant was extended to September 4, 2025.  *See* Main Bankr. ECF No. 322.

33.     On September 4, 2025, the Plaintiff provided an accounting (the "Accounting") to the Defendant which stated that the Plaintiff and/or the Debtors expended $913,506.21 in the post-sale closing period for the benefit of the Defendant ("Post-Closing Expenses").  A true and correct copy of the Accounting is attached hereto as **Exhibit D.**

34.     The Defendant did not provide a written response to each line item of the accounting provided by the Plaintiff for which it disagreed.

**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

35.    The Defendant defaulted under the Contract by failing to make the quarterly payment, in the amount of $83,333.33 due on June 30, 2025, and all subsequent payments due thereafter.

36.    The Defendant further defaulted under the Contract by failing to pay the Post Closing Expenses.

## COUNT 1:
## BREACH OF CONTRACT

37.    The Plaintiff realleges the allegations set forth in the paragraphs 1 through 36 and incorporates those allegations by reference.

38.    The Debtors and the Defendant executed the Contract.

39.    The Debtors fully performed their obligations under the Contract by delivering all assets sold to Defendant, and otherwise complying with all aspects of the APA and this Court's Sale Order.

40.    Post-closing, both the Debtor and then Plaintiff performed substantial Post-Closing Services, which were accepted by the Defendant.

41.    The Defendant has defaulted under the Contract by failing to make the quarterly payment, in the amount of $83,333.33 due on June 30, 2025, and all subsequent payments due thereafter.

42.    The Defendant further defaulted under the Contract by failing to pay the Post-Closing Expenses in the amount of $913,506.21

43.    Plaintiff has suffered damages caused by Defendant's breach.

WHEREFORE, the Plaintiff respectfully requests the Court enter a judgment against the Defendant for the damages the Plaintiff has incurred and will incur as a result of the Defendant's



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

breaches of the Contract, award attorneys' fees and costs, and grant such other and further relief as the Court may deem just and proper.

## COUNT 2:
## TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. §542(B)

44.     The Plaintiff realleges the allegations set forth in the paragraphs 1 through 36 and incorporates those allegations by reference.

45.     The Bankruptcy Code defines the bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* 11 U.S.C. § 541(a)(1).

46.     The quarterly payments, each in the amount of $83,333.33, that were due on June 30, 2025, September 30, 2025, and December 31, 2025 (the "Past Due Quarterly Payments"), are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541.

47.     Pursuant to 11 U.S.C. § 542(b), "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."   11 U.S.C. § 542(b).

48.     The Defendant owes a debt, the Past Due Quarterly Payments, that is property of the estate.

49.     The Past Due Quarterly Payments are fully matured and are presently due and payable.

50.     The Past Due Quarterly Payments are liquidated and noncontingent, and no *bona fide* dispute exists over Defendants liability to the Plaintiff for such payments.

8

51.     The Past Due Quarterly Payments are not subject to any valid, enforceable right of setoff or recoupment by Defendant, or that any such rights have been waived, satisfied, or lack factual/legal basis.

52.     The Plaintiff will be substantially harmed if these funds are not turned over, and such harm may impede the Plaintiff's efforts to reorganize and make a distribution to creditors.

53.     Accordingly, the Plaintiff is entitled to immediate turnover of the Past Due Quarterly Payments.

54.     Additionally, the Defendant owes the estate $913,506.21 in Post-Closing Expenses which are due, and have not been reasonably or substantively disputed by Defendant.

55.     In fact, Defendant's failure to object with specificity to the Post-Closing Expenses is deemed acceptance of that amount by the Defendant.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter judgment against the Defendant to turnover the Past Due Quarterly Payments in the amount of $249,999.99, $913,506.21 in Post-Closing Expenses, plus interest and costs, and granting such other and further relief as the Court may deem just and proper.

## COUNT 3:
## ACCOUNT STATED

56.     The Plaintiff realleges the allegations set forth in the paragraphs 1 through 36 and incorporates those allegations by reference.

57.     Following the closing of the sale and during the post-closing transition period, the Plaintiff and/or the Debtors incurred expenses for the benefit of the Defendant in connection with the Transferred Assets and the continued operation of the business.

9

58.     Pursuant to the Termination Order, the Plaintiff was required to provide, and did provide, an accounting of all expenses incurred for the benefit of the Defendant.

59.     On or about September 4, 2025, the Plaintiff provided the Defendant with the Accounting identifying the Post-Closing Expenses incurred in the total amount of $913,506.21.

60.     The Termination Order required the Defendant to respond in writing to each line item of the Accounting with which it disagreed within a specified time period.

61.     The Defendant failed to provide any written objection to the Accounting, including any objection to specific line items, within the time required by the Termination Order, or at all.

62.     By failing to object to the Accounting within the time required, the Defendant assented to the correctness of the Accounting and the amount due.

63.     The Accounting constitutes an account stated between the Plaintiff and the Defendant for the Post-Closing Expenses in the amount of $913,506.21.

64.     The Defendant has failed and refused to pay the amount due under the account stated.

65.     As a result of the Defendant's failure to pay, the Plaintiff has been damaged in the amount of at least $913,506.21, plus interest.

**WHEREFORE,** the Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against the Defendant for the amount of $913,506.21, plus pre- and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT 4:
## UNJUST ENRICHMENT

10

66.     The Plaintiff realleges the allegations set forth in the paragraphs 1 through 36 and incorporates those allegations by reference.

67.     In the alternative, and only to the extent that the Contract is found not to govern or to be unenforceable as to some or all of the benefits conferred, the Debtors conferred a benefit on the Defendant by virtue of the Transferred Assets and the Post-Closing Expenses.

68.     The Defendant voluntarily accepted and retained the benefit conferred by accepting the Transferred Assets and the Post-Closing Expenses.

69.     The circumstances set forth above render the Defendant's retention of the Transferred Assets and Post-Closing Expenses inequitable unless the Defendant pays the Plaintiff the value of the Transferred Assets and Post-Closing Expenses.

70.     The Defendant was unjustly enriched by virtue of the Transferred Assets and Post-Closing Expenses.

WHEREFORE, the Plaintiff respectfully requests the Court to enter a judgment against the Defendant:  (i) granting money damages to the Plaintiff against the Defendant in the amount of the Transferred Assets and Post-Closing Expenses., plus pre- and post-judgment interest; and (ii) granting such other and further relief as may be equitable and just.

## COUNT 5:
## <u>ENFORCEMENT OF COURT ORDERS AND CIVIL CONTEMPT</u>

71.     The Plaintiff realleges the allegations set forth in the paragraphs 1 through 36 and incorporates those allegations by reference.

72.     On December 17, 2024, this Court entered the Sale Order, which approved the Asset Purchase Agreement and authorized the sale of substantially all of the Debtors' assets to the Defendant.



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

73.     On April 18, 2025, this Court entered the Termination Order, which, among other things:

a. required the Defendant to indemnify and hold harmless the Debtors, the Plaintiff, and the bankruptcy estates from liabilities arising from the Defendant's use of the Debtors' EIN; and

b. required the Plaintiff to provide an accounting of expenses incurred for the benefit of the Defendant and required the Defendant to respond in writing to each disputed line item within a specified time period.

74.     The Sale Order and the Termination Order are valid and enforceable orders of this Court.

75.     The Defendant had actual knowledge of the Sale Order and the Termination Order.

76.     The Sale Order and Termination Order required the Defendant, among other things, to:

a.  comply with the obligations under the Contract approved by the Court;

b.  indemnify and hold harmless the Debtors and the estate for liabilities arising from its use of the Debtors' EIN; and

c.  timely respond to the Plaintiff's Accounting by identifying specific disputed line items.

77.     The Plaintiff complied with her obligations under the Termination Order by providing the Accounting on or about September 4, 2025.

78.     The Defendant failed to comply with the Termination Order by, among other things:

12



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

    a.  failing to provide a written response to the Accounting identifying disputed line items;

    b.  failing to pay the Post-Closing Expenses; and

    c.  failing to satisfy its indemnification obligations.

79.    The Defendant's violations of the Sale Order and Termination Order were willful and intentional.

80.    The Defendant's failure to comply with this Court's orders has caused harm to the Plaintiff and the bankruptcy estates, including but not limited to, unpaid administrative expenses and exposure to liability arising from the use of the Debtors' EIN.

81.    The Defendant's conduct constitutes civil contempt of this Court.

82.    The Plaintiff is entitled to relief for the Defendant's contempt, including but not limited to:

    a.  an order compelling compliance with the Sale Order and Termination Order;

    b.  a monetary judgment for all amounts due

    c.  compensatory damages;

    d.  attorneys' fees and costs incurred in enforcing the Court's orders; and

    e.  such other sanctions as the Court deems appropriate.

**WHEREFORE,** the Plaintiff respectfully requests that this Court enter a judgment against the Defendant: (i) finding that the Defendant is in civil contempt of the Sale Order and Termination Order; (ii) compelling the Defendant to comply with such orders; (iii) awarding the Plaintiff compensatory damages, including all amounts due and owing; (iv) awarding attorneys' fees and costs; and (v) granting such other and further relief as the Court deems just and proper.

13

Dated: March 19, 2026

AGENTIS PLLC
***Counsel for the Plaintiff Trustee***
45 Almeria Avenue
Coral Gables, Florida 33134
T. 305.722.2002
www.agentislaw.com

By:   */s/ Jesse R. Cloyd*
      Jesse R. Cloyd
      Florida Bar No: 58388
      jrc@agentislaw.com

# Exhibit "A"

**ASSET PURCHASE AGREEMENT**

**by and between**

**SHIFTPIXY, INC., SHIFTPIXY STAFFING, INC. AND RETHINK HUMAN CAPITAL MANGEMENT, INC.**

**and**

**G3 BUSINESS SERVICES LLC**

**dated as of**

**December 10, 2024**

## TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE ..................................................................................... 1

 1.1 Purchase and Sale of the Transferred Assets .................................................... 1

 1.2 Excluded Assets ................................................................................................. 2

 1.3 Assumption of Certain Liabilities ..................................................................... 2

 1.4 Excluded Liabilities ........................................................................................... 2

 1.5 Assumption/Rejection of Certain Contracts ..................................................... 2

ARTICLE II BANKRUPTCY COURT APPROVAL AND OTHER MATTERS ..................... 3

 2.1 Sale Process ....................................................................................................... 3

 2.2 Bankruptcy Court Matters .................................................................................. 3

 2.3 Entry of Order Approving Sale .......................................................................... 3

ARTICLE III INSTRUMENTS OF TRANSFER AND ASSUMPTION ................................. 4

ARTICLE IV CONSIDERATION; ALLOCATION ................................................................ 4

 4.1 Consideration; Payment ..................................................................................... 4

 4.2 Deposit ............................................................................................................... 5

 4.3 Withholding ........................................................................................................ 5

 4.4 Allocation ........................................................................................................... 5

ARTICLE V CLOSING ............................................................................................................ 6

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 6

 6.1 Organization, Qualification and Authority ........................................................ 6

 6.2 Authorization, Execution and Delivery of Agreement and Transaction
   Documents .......................................................................................................... 6

 6.3 Title to Assets .................................................................................................... 6

 6.4 Legal Proceedings .............................................................................................. 6

 6.5 Brokers ............................................................................................................... 7

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF BUYER .............................. 7

 7.1 Organization, Qualification and Authority ........................................................ 7

 7.2 Authorization, Execution and Delivery of Agreement and Transaction
   Documents .......................................................................................................... 7

 7.3 Brokers ............................................................................................................... 7

 7.4 No Violation of Laws or Agreements ................................................................ 7

ARTICLE VIII COVENANTS AND AGREEMENTS ............................................................ 7

 8.1 Conduct of Business ........................................................................................... 7

 8.2 Notification of Certain Matters .......................................................................... 8

 8.3 Access to Information ......................................................................................... 8

 8.4 Public Announcement ........................................................................................ 8

 8.5 Taxes .................................................................................................................. 9

 8.6 Further Assurances; Post-Closing Access ......................................................... 9

 8.7 Confidentiality .................................................................................................... 9

 8.8 No Survival of Representations and Warranties ............................................... 10

1

8.9      Change of Name ........................................................................................................... 10

ARTICLE IX CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE ....................... 10

9.1      Accuracy of Representations and Warranties; Performance of this Agreement ............... 10
9.2      Officer's Certificate ..................................................................................................... 10
9.3      Transfer, Assignment and Assumption Documents ........................................................ 10
9.4      Data Room ................................................................................................................... 10
9.5      Bankruptcy Matters ...................................................................................................... 10
9.6      Winning Bidder ............................................................................................................ 10
9.7      Required Consents ....................................................................................................... 11
9.8      Release of Deposit ....................................................................................................... 11

ARTICLE X CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE ...................... 11

10.1    Accuracy of Representations and Warranties; Performance of this Agreement ............... 11
10.2    Officer's Certificate ..................................................................................................... 11
10.3    Transfer, Assignment and Assumption Documents ........................................................ 11
10.4    Bankruptcy Matters ...................................................................................................... 11
10.5    Winning Bidder ............................................................................................................ 11
10.6    Release of Deposit. ...................................................................................................... 11

ARTICLE XI TERMINATION ....................................................................................................... 11

11.1    Breaches and Defaults; Opportunity to Cure ................................................................ 11
11.2    Termination .................................................................................................................. 12

ARTICLE XII MISCELLANEOUS ................................................................................................. 12

12.1    Notices ........................................................................................................................ 12
12.2    Expenses ...................................................................................................................... 13
12.3    Governing Law ............................................................................................................ 13
12.4    Assignment .................................................................................................................. 13
12.5    Successors and Assigns ................................................................................................ 14
12.6    Amendments; Waivers .................................................................................................. 14
12.7    Entire Agreement ......................................................................................................... 14
12.8    Counterparts ................................................................................................................ 14
12.9    Severability ................................................................................................................. 14
12.10  Section Headings; Interpretation ................................................................................. 14
12.11  Third Parties ................................................................................................................ 14
12.12  Specific Performance ................................................................................................... 14
12.13  Exhibits ....................................................................................................................... 15
12.14  Definitions ................................................................................................................... 15

**ASSET PURCHASE AGREEMENT**

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of December 8, 2024, by and between G3 Business Services LLC, a New Jersey limited liability company ("Buyer"), and Shiftpixy, Inc., Shiftpixy Staffing, Inc. and ReThink Human Capital Management, Inc. (each a "Seller" and, collectively, "Sellers"). Capitalized terms used but not defined in the context in which they are used shall have the respective meanings assigned to such terms in Section 12.13.

**WHEREAS**, on October 28, 2024 (the "Petition Date"), each Seller filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court" and the cases arising under each such petition, collectively, the "Bankruptcy Cases");

**WHEREAS**, the Sellers are debtors-in-possession and no trustee has been appointed in the Bankruptcy Cases.

**WHEREAS**, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Transferred Assets, free and clear of all Liens, together with the Assumed Liabilities of Sellers, upon the terms and subject to the conditions set forth in the Agreement (collectively with the transactions contemplated by this Agreement and the other Transaction Documents, the "Transaction");

**WHEREAS**, Buyer wishes to purchase and take delivery of the Transferred Assets and assume the Assumed Liabilities upon such terms and subject to such conditions;

**WHEREAS**, the Transferred Assets will be sold pursuant to the Sale Order under Sections 363 and 365 of the Bankruptcy Code;

**WHEREAS**, certain of the obligations of Sellers under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article II; and

**WHEREAS**, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the Transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants, representations, warranties and agreements set forth in this Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I**
**PURCHASE AND SALE**

1.1     Purchase and Sale of the Transferred Assets. Pursuant to sections 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, all of Sellers' right, title, and interest as of the Closing in and to the Transferred Assets, free and clear of all Liens other than Permitted Liens. "Transferred Assets" means all of the assets that are set forth on Schedule 1.1 (including sub-Schedules A - H), including all goodwill associated with the Transferred Assets, but excluding, the Excluded Assets.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey, or deliver, and Sellers shall retain all right, title, and interest to, in and under all assets, properties, interests, and rights of each such Seller, that are not Transferred Assets (collectively, the "Excluded Assets").

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 12.4, Buyer shall irrevocably assume from Sellers (and, from and after the Closing, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, only the following Liabilities, without duplication and only to the extent not paid, performed, discharged, or otherwise satisfied prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities and obligations of Sellers arising out of or relating to the Assigned Contracts;

(b)     any Liabilities and obligations related to the Transferred Assets for the post-Closing period; and

(c)     payment of all Cure Costs.

1.4     Excluded Liabilities. Buyer shall not assume, be obligated to pay, perform, or otherwise discharge any Liabilities that are not Assumed Liabilities (the "Excluded Liabilities").

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts in accordance with the Bidding Procedures Order and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Buyer pursuant to section 365 of the Bankruptcy Code. The Sale Order shall provide that, as of and conditioned on the occurrence of the Closing, Sellers shall assign to Buyer the Assigned Contracts, which assumption shall be effectuated in accordance with the Bidding Procedures Order. The notice of assumption to be filed and served in accordance with the Bidding Procedures Order shall, among other things, set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court ("Cure Costs"). At the Closing, Sellers shall, pursuant to the Sale Order, Bidding Procedures Order, and the Assignment and Assumption Agreement, assume and assign to Buyer (the consideration for which is included in the Purchase Price), all Assigned Contracts pursuant to sections 363 and 365 of the Bankruptcy Code. At the Closing, Buyer shall (i) pay all Cure Costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Non-Assignment. Buyer acknowledges that the Sale Order will authorize the assumption and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto. To the extent any Assumed Contract is not assumable and assignable by Sellers to Buyer under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Sellers shall use their reasonable best efforts prior to Closing to obtain all such required consents of third parties that are necessary for the consummation of the Transactions contemplated hereby (the "Required Consents"). All

2

such Required Consents shall be in writing, in form and substance reasonably acceptable to Buyer, and executed counterparts thereof shall be delivered to Buyer on or before five (5) days prior to the Closing Date. If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Buyer would not receive all such rights, and Buyer elects to waive such Required Consent as a condition to Closing or otherwise proceeds with the Closing, Sellers shall continue to use their reasonable best efforts (at Buyer's expense) to obtain such Required Consents following the Closing and, until obtained, use their reasonable best efforts after Closing to provide to Buyer the benefits under any such Assumed Contract or any claim or right, including, without limitation, enforcement for the benefit of Buyer of any and all rights of Sellers against a third party thereto arising out of the default or cancellation by such third party or otherwise.

## ARTICLE II
## BANKRUPTCY COURT APPROVAL AND OTHER MATTERS

2.1    Sale Process. From the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any Person (in addition to Buyer and its Affiliates and representatives) in connection with submitting any Qualified Bid in accordance with the Bidding Procedures Order. In addition, Sellers shall have the authority to respond to any inquiries or offers with respect to a Qualified Bid and perform any and all other acts related thereto to the extent any such act is not in violation of the Bidding Procedures Order or the Bankruptcy Code. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of the Transferred Assets, as determined in Seller's sole and exclusive discretion in accordance with the Bidding Procedures Order.

2.2    Bankruptcy Court Matters.

(a)    Sale Motion. On November 18, 2024, Sellers filed the Sale Motion. Sellers shall not alter, modify, or withdraw the Sale Motion without the prior consent of Buyer in its sole and absolute discretion.

(b)    This Agreement. On or before December 12, 2024, Sellers shall file this Agreement with the Bankruptcy Court and provide all required notice of this Agreement.

2.3    Entry of Order Approving Sale.

(a)    If this Agreement and the sale of the Transferred Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, the Sale Order shall be in accordance with the terms of this Agreement, and shall, among other things:

(i)    approve this Agreement (as may be amended following an Auction, if one is held and Buyer presents the Successful Bid) and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby;

(ii)    approve and direct the sale and transfer of the Transferred Assets to Buyer and approve and direct the assumption and assignment of the Assumed Contracts to Buyer free and clear of all Liens, Claims or interests, based on appropriate findings and rulings pursuant to, *inter alia*, Sections 363(b), 363(f), 363(m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), 365(i), 365(l) and 365(n) of the Bankruptcy Code and the release of Buyer of any rights otherwise associated with, and which may otherwise be to the benefit of, any third parties;

3

(iii)    include a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iv)    include a finding that Buyer is not deemed to be a successor to Sellers, to have, de facto or otherwise, merged with or into Sellers or to be a mere continuation of Sellers;

(v)    include a finding that the Consideration is a fair and reasonable price for the Transferred Assets;

(vi)    include a finding that Buyer will not have any derivative, successor, transferee or vicarious Liability for Liabilities of any Seller or any Affiliates of any Seller by reason of any theory of Law or equity (whether under federal or state Law or otherwise) as a result of the transactions contemplated by this Agreement, including but not limited to any Liabilities on account of Transfer Taxes, except as expressly assumed by Buyer in this Agreement;

(vii)    include a finding that, to the maximum extent permitted by the Bankruptcy Code, the so-called "bulk sales," "bulk transfer" or similar Laws in any applicable jurisdictions do not apply;

(viii)    include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired Lease or right of entry; and

(ix)    include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Transferred Assets and claims against the Transferred Assets which arose or were based on facts or occurrences prior to the Closing. Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended.

(b)    Sellers shall provide notice of the Sale Hearing and any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any applicable local rules of bankruptcy procedure or as otherwise ordered by the Bankruptcy Court.

**ARTICLE III**
**INSTRUMENTS OF TRANSFER AND ASSUMPTION**

At the Closing, Sellers will deliver to Buyer (a) one or more bills of sale as may be reasonably required by Buyer, (b) one or more assignment and assumption agreements as may be reasonably required by Buyer, (c) one or more trademark assignment agreements as may be reasonably required by Buyer, and (d) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement as shall be reasonably necessary to vest in Buyer (or its designee(s)) all of Sellers' right, title and interest in, to and under the Transferred Assets.

**ARTICLE IV**
**CONSIDERATION; ALLOCATION**

4.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Consideration") to be paid by Buyer for the purchase of the Transferred Assets shall be:

      (i)      the assumption of Assumed Liabilities,

      (ii)      a cash payment equal to $1,850,000.00 (the "Cash Payment"), and

      (iii)      the payment of Cure Costs.

(b)      At the Closing, Buyer shall deliver, or cause to be delivered to Sellers, the Cash Payment less the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

4.2      Deposit.

(a)      Buyer has, on or prior to the date hereof, made an earnest money deposit with Hilco IP Services, LLC d/b/a Hilco Streambank ("Hilco Streambank") in an amount equal to $185,000.00 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate account (the "Deposit Account"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Buyer and shall be applied against payment of the Purchase Price on the Closing Date.

(b)      If this Agreement has been terminated by Sellers pursuant to Section 11.1(e) or 11.1(f) (or by Buyer pursuant to Section 11.1(b), 11.1(c), or 11.1(d), in each case in circumstances where Sellers would be entitled to terminate this Agreement pursuant to Section 11.1(e) or 11.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)      If this Agreement has been terminated by any Party, other than as contemplated by Section 4.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Buyer within five (5) Business Days after such termination.

(d)      The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 4.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)      If the Closing occurs, the Deposit shall be transferred to Sellers.

4.3      Withholding. Buyer shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement.

4.4      Allocation. Within a reasonable time following the Closing, Buyer shall deliver to Sellers a statement allocating the Consideration among the Transferred Assets in accordance with Section 1060 of the Code (the "Allocation Statement"). Sellers and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax Returns in accordance with the Allocation Statement.

**ARTICLE V**
**CLOSING**

Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place virtually (by delivery of executed documents via pdf, DocuSign or other electronic means), no later than the second Business Day following the date on which all conditions to Closing set forth in Article IX and Article X have been satisfied or waived (the date on which the Closing is actually held, the "Closing Date"). If it occurs, the Closing shall be effective as of 12:01 a.m. Eastern time on the Closing Date.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers represent and warrant to Buyer that the following statements contained in this Article VI are true and correct as of the date hereof and as of the Closing Date:

6.1     Organization, Qualification and Authority. Sellers are entities duly organized, validly existing and in good standing under the Laws of their jurisdiction of formation and under the Laws of each jurisdiction where qualification as a foreign entity is required, except where the lack of such qualification would not, individually or in the aggregate, reasonably be expected to be material. Sellers have all necessary power and authority to own and operate their properties and to carry on their business as is now being conducted in the Bankruptcy Cases. Sellers have the power and authority to execute and deliver and perform their obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby.

6.2     Authorization, Execution and Delivery of Agreement and Transaction Documents. The execution, delivery, and performance of this Agreement and the other Transaction Documents by Sellers and the transfer or assignment of the Transferred Assets to Buyer have been duly and validly authorized and approved by all necessary corporate or other entity action. This Agreement and each of the Transaction Documents constitute Sellers' legal, valid and binding obligations, enforceable against each Seller (to the extent it is a party thereto) in accordance with their respective terms, subject to Laws of general application relating to the rights of creditors generally and the availability of equitable remedies. Subject to order of the Bankruptcy Court and pursuant thereto, Sellers will have full power, right and authority to sell and convey to Buyer the Transferred Assets.

6.3     Title to Assets. Sellers have good and marketable title to, or a valid leasehold interest in, all of the properties and assets included in the Transferred Assets. Sellers have the power and right to use, transfer, sell, convey, assign and deliver, and shall at Closing transfer, sell convey, assign and deliver to Buyer, each of the Transferred Assets owned by them, free and clear of all Liens. The delivery to Buyer at the Closing of the Transaction Documents, together with the Sale Order, will vest in Buyer good and marketable title to the Transferred Assets, free and clear of all Liens. The delivery to Buyer at the Closing of the Transaction Documents will vest in Buyer a valid, binding and enforceable leasehold interest in, or other valid, binding and enforceable right to possess and use, the Transferred Assets that are not owned by Sellers, in accordance with the Contracts applicable to such Transferred Assets, copies of which Contracts have been provided to Buyer.

6.4     Legal Proceedings. Except as set forth on Schedule 6.4, there is no Legal Proceeding pending or, to the Knowledge of Sellers, threatened in writing against or affecting Sellers or the Transferred Assets (or to the Knowledge of Sellers, pending or threatened, against any of the officers, directors or employees of Sellers with respect to their business activities related to or affecting the Transferred Assets) (a) that challenges or that is reasonably expected to have the effect of preventing, making illegal, delaying

6

or otherwise interfering with any of the transactions contemplated by this Agreement; or (b) that is related to the Transferred Assets or Assumed Liabilities.

6.5     Brokers. Except for Hilco Streambank, for whom Sellers shall be solely responsible for any fees, commissions or other amounts owing or that may become due and owing, Sellers have not engaged or incurred any Liability to any agent, broker or other Person acting pursuant to the express or implied authority of Sellers which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Transferred Assets.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

7.1     Organization, Qualification and Authority. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New Jersey. Buyer has all necessary limited liability company power and authority to (a) own and operate its properties, (b) carry on its business as it is now being conducted, and (c) perform its obligations under this Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby.

7.2     Authorization, Execution and Delivery of Agreement and Transaction Documents. All necessary consents and approvals have been obtained by Buyer for the execution and delivery of this Agreement and the Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Buyer have been duly and validly authorized and approved by all necessary limited liability company action. Buyer has full limited liability company power, right and authority to acquire the Transferred Assets. This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting creditors.

7.3     Brokers. Buyer has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Buyer that is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Transferred Assets.

7.4     No Violation of Laws or Agreements. The performance by Buyer of its obligations contemplated hereunder and the consummation by Buyer of the transactions contemplated herein will not violate (a) any Laws or any order, writ, injunction, decree, judgment, award, consent, settlement, stipulation, regulation or rule of any court or Governmental Entity to which Buyer is subject; or (b) contravene, conflict with or result in a violation of any provision of any organizational documents of Buyer; except that would not, individually or in the aggregate, materially adversely affect Buyer's ability to consummate the transactions contemplated hereby.

## ARTICLE VIII
## COVENANTS AND AGREEMENTS

8.1     Conduct of Business. Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Buyer, from the date hereof until the Closing Date, Sellers shall use reasonable best efforts to preserve intact the Transferred Assets. Without limiting the generality of the foregoing (but subject to the express limitation set forth in the immediately preceding sentence), Sellers

7

will, other than with Buyer's consent (which consent shall not be unreasonably withheld or delayed), refrain from doing any of the following:

(a)    dispose of, transfer, assign or license, any Transferred Asset;

(b)    except as otherwise provided or required in this Agreement, reject, terminate, enter into or amend any other material Contract with respect to the businesses of any Seller that would affect the Transferred Assets or the Assumed Liabilities;

(c)    sell, transfer, license, encumber, or otherwise dispose of any Sellers-Owned Intellectual Property;

(d)    enter into any agreement or commitment that would subject Sellers to any non-competition, non-solicitation or any other material restrictions on Sellers' ability to conduct its business, or that limits or restricts the use of the Sellers-Owned Intellectual Property or any other Intellectual Property in which Sellers have any interest or right; or

(e)    authorize any of, or commit, agree in writing or otherwise, to take any of, the foregoing actions.

8.2    <u>Notification of Certain Matters</u>. Sellers shall give written notice to Buyer of: (a) a breach of any representation or warranty or covenant of Sellers contained in this Agreement, and (b) the occurrence, or failure to occur, of any event that would be reasonably likely to cause any representation or warranty of Sellers contained in this Agreement to be untrue or inaccurate at any time prior to the Closing determined as if such representation or warranty were made at such time.

8.3    <u>Access to Information</u>. From the date hereof and through the date on which the Closing occurs or this Agreement is terminated, Sellers shall cooperate with Buyer and shall give Buyer and its representatives (including Buyer's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, access to the properties, Contracts, Leases, equipment, employees, affairs, books, documents, records, data and other information of Sellers to the extent relating to the Transferred Assets, the Assumed Liabilities and any other aspect of this Agreement, and shall cause their respective officers, employees, agents and representatives to furnish to Buyer all available documents, records and other information (and copies thereof), to the extent relating the Transferred Assets, the Assumed Liabilities, and any other aspect of this Agreement, in each case, as Buyer may reasonably request (and Seller shall use reasonable best efforts to obtain any and all consents necessary or advisable, including with respect to personnel files, to permit the sharing of such information under applicable Laws). From and after the Closing Date, Buyer shall give Seller's bankruptcy estate (either the Chief Restructuring Officer or any duly appointed Chapter 7 Trustee reasonable access at the expense of the bankruptcy estate to information necessary to analyze, defend, prosecute any litigation claim or object to any claim made against the bankruptcy estate of Seller.

8.4    <u>Public Announcement</u>. Subject to the provisions of the Bankruptcy Code and Sellers' right to make such filings and disclosures as are necessary in connection with the Bankruptcy Cases including, without limitation, marketing the Transferred Assets in accordance with the Bidding Procedures Order, no party hereto shall make or issue, or cause to be made or issued, any public announcement or written statement (including any written communication or material communications to current employees of any Seller) concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party hereto (which will not be unreasonably withheld or delayed), unless counsel to such party advises that such announcement or statement is required by Law (in which case the parties hereto shall make reasonable efforts to consult with each other prior to such required announcement). Notwithstanding

8

anything herein to the contrary, prior to making any filings or disclosures in connection with the Bankruptcy Cases, Sellers shall provide Buyer with a reasonable opportunity to review the text of any such filings or disclosures and incorporate all reasonable comments received from Buyer or its representatives, including any redactions or requests for confidential treatment.

8.5    Taxes.

(a)    Sellers shall be responsible for all Taxes arising out of the ownership of the Transferred Assets or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, including Transfer Taxes, and, for the avoidance of doubt, all such Taxes shall be Excluded Liabilities. Without limiting the foregoing, all Transfer Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Sellers.

(b)    Sellers and Buyer shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (ii) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (iii) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

8.6    Further Assurances; Post-Closing Access. Subject to the other provisions hereof, Sellers shall use their reasonable best efforts to perform their obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other party hereto and their representatives in connection with any action required to be taken as a part of their obligations hereunder. From time to time after the Closing, each of Buyer and Sellers, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement; provided that, notwithstanding anything to the contrary in this Section 8.6 or any other provision of this Agreement, neither Buyer nor Sellers shall be required to execute any document or take any action that would (a) increase the Liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (b) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (c) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement; provided, further that Sellers obligations terminate upon the effective date of a confirmed plan of liquidation, or conversion or dismissal of the Bankruptcy Cases.

8.7    Confidentiality. Buyer acknowledges that it has had access to and the use of confidential materials and information and trade secrets concerning the Transferred Assets, and that the protection of such confidential materials and information and trade secrets is necessary to protect and preserve the value of the Transferred Assets after the Closing. Buyer shall not use, for itself or others, or disclose, divulge or convey to others, except as necessary to fulfill its obligations under this Agreement or Buyer's Transaction Documents, any proprietary or confidential information or data related to the Transferred Assets. Confidential information and data shall include proprietary or confidential matters not published or generally known in the relevant trade or industry such as and including information about prices, costs, purchasing, profits, markets, sales or customer lists, future developments or future marketing, or merchandising but shall not include any information or data (a) that is generally available to the public (other than as a result of the disclosure directly or indirectly by Buyer or its representatives or agents), (b)

9

that is made available to Buyer by a third party on a non-confidential basis provided that such third party is not bound by a confidentiality agreement, or other obligation of secrecy to, with respect to such information, or (c) that is independently developed after Closing by Buyer without reference to any confidential information protected hereunder.

8.8     No Survival of Representations and Warranties. The representations and warranties of Sellers and Buyer contained in this Agreement shall terminate as of the Closing.

8.9     Change of Name. Following the Closing, and, in any event, within fifteen (15) days, each Seller shall, and shall cause their Subsidiaries to, discontinue the use of their current name (and any other trade names or "d/b/a" names currently utilized by each Seller or their Subsidiaries) and shall not subsequently change any of their names to or otherwise use or employ any name which includes the words "ShiftPixy" and the other names used by Sellers without the prior written consent of Buyer, and each Seller shall cause the name of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE**

The obligation of Buyer under this Agreement with respect to the purchase and sale of the Transferred Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Buyer:

9.1     Accuracy of Representations and Warranties; Performance of this Agreement. Each of the representations and warranties made by Sellers shall be true and correct in all material respects on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date. Sellers shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by them on or prior to the Closing.

9.2     Officer's Certificate. Sellers shall have delivered to Buyer a certificate, duly executed by an executive officer of Sellers (including incumbency certificates), certifying Sellers' compliance with the conditions set forth in Section 9.1.

9.3     Transfer, Assignment and Assumption Documents. Sellers shall have delivered to Buyer the Bill of Sale(s), Assignment and Assumption Agreement(s), Trademark Assignment Agreement(s) and other transfer documents required to be delivered pursuant to Article III, each duly executed by Sellers.

9.4     Data Room. Sellers shall have provided Buyer access to the data room maintained by Hilco Streambank in connection with the transactions contemplated by this Agreement (the "Data Room").

9.5     Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court on or before December 18, 2024 (or such later time as is agreed in writing by Buyer in its sole and absolute discretion).

9.6     Winning Bidder. Buyer shall have been deemed the Successful Bidder (as such term is defined in the Bidding Procedures Order) for the Transferred Assets at any Auction.

9.7     <u>Required Consents</u>. Buyer shall have received or waived all Required Consents, in form and substance reasonably satisfactory to Buyer, which may be provided by either affirmative consent or operation of law.

9.8     <u>Release of Deposit.</u>  Sellers shall have delivered to Buyer a joint written instruction, duly executed by Seller, instructing Hilco Streambank to release to Sellers by wire transfer of immediately available funds, the Deposit.

**ARTICLE X**
**CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE**

The obligation of Sellers under this Agreement with respect to the purchase and sale of the Transferred Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Sellers:

10.1     <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date. Buyer shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

10.2     <u>Officer's Certificate</u>. Buyer shall have delivered to Sellers a certificate, duly executed by an executive officer of Buyer (including incumbency certificates), certifying Buyer's compliance with the conditions set forth in <u>Section 10.1</u>.

10.3     <u>Transfer, Assignment and Assumption Documents</u>. Buyer shall have delivered to Sellers the documents required to be delivered by Buyer, if any, pursuant to <u>Article III</u>, each duly executed by Buyer.

10.4     <u>Bankruptcy Matters</u>. The Sale Order shall have been entered by the Bankruptcy Court.

10.5     <u>Winning Bidder</u>. Buyer shall have been deemed the Successful Bidder (as such term is defined in the Bidding Procedures Order) for the Transferred Assets at any Auction.

10.6     <u>Release of Deposit</u>.  Buyer shall have delivered to Sellers a joint written instruction, duly executed by Buyer, instructing Hilco Streambank to release to Sellers by wire transfer of immediately available funds, the Deposit.

**ARTICLE XI**
**TERMINATION**

11.1     <u>Breaches and Defaults; Opportunity to Cure</u>. Prior to the exercise by a party of any termination rights afforded under this Agreement, if either party (the "<u>Non-Breaching Party</u>") believes the other (the "<u>Breaching Party</u>") to be in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon, if such breach is curable the Breaching Party, shall have ten (10) calendar days from the receipt of such notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party. If the breach is not cured within such time period, then the Non-Breaching Party's sole remedy shall be to terminate this Agreement if the breach is such that the condition set forth in <u>Section 9.1</u> or <u>Section 10.1</u>, as applicable,

11

shall not be satisfied (as provided in Section 11.2); provided, however, that the Non-Breaching Party shall not be entitled to terminate this Agreement if it is in material breach of this Agreement.

11.2    Termination. This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing:

(a)      by mutual written consent of Sellers and Buyer;

(b)      by Buyer, if any of the deadlines set forth in Section 2.2 are not met or satisfied;

(c)      unless Buyer is the Next-Highest Bidder, if the Bankruptcy Court enters an order approving the sale of the Transferred Assets to the Successful Bidder;

(d)      subject to the right to cure set forth in Section 11.1, by Buyer if Sellers are in breach of any covenant, representation, undertaking or warranty such that the condition set forth in Section 9.1 shall not be satisfied, and Buyer has not waived such condition in writing on or before the Closing Date;

(e)      subject to the right to cure set forth in Section 11.1, by Sellers if Buyer is in breach of any covenant, representation, undertaking or warranty such that the condition set forth in Section 10.1 shall not be satisfied, and Sellers have not waived such condition in writing on or before the Closing Date; or

(f)      by Sellers or Buyer if the Closing shall not have occurred on or before the Outside Date, unless the failure to have the Closing on or before the Outside Date shall be due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing.

**ARTICLE XII**
**MISCELLANEOUS**

12.1    Notices. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or sent by a nationally recognized overnight courier or registered or certified U.S. mail, return receipt requested, postage prepaid or electronic mail (with confirmation of receipt), to the following addresses:

If to Sellers:

Phang Feldman
2 South Biscayne Boulevard, Suite 1600
Miami, FL 33131
Attn:    Jonathan Feldman
Email:  feldman@katiephang.com

with a copy to (which shall not constitute notice):

DGIM Law
2875 NE 191st Street, Suite 705
Aventura, FL 33180

Attn: Isaac Marcushamer
Email: isaac@dgimlaw.com


If to Buyer:

G3 Business Services LLC
16 Mt. Bethel Rd. #112
Warren, NJ 07059
Attn: J. Ram Ajjarapu
Email: Ram@IntlCap.net

with a copy to (which shall not constitute notice):

Kaizen Law PC
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
Attn: Chris Todd
Chris@KaizenLawyer.com


Notices delivered personally shall be effective upon delivery against receipt. Notices transmitted by electronic mail shall be effective when received, provided that the burden of proving when notice is transmitted by electronic mail shall be the responsibility of the party providing such notice. Notices delivered by overnight courier shall be effective when received. Notices delivered by registered or certified U.S. mail shall be effective on the date set forth on the receipt of registered or certified delivery or 72 hours after mailing, whichever is earlier.

12.2     Expenses. Each party shall bear its own expenses and costs, including the fees and expenses of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

12.3     Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of Florida (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Cases have been closed, the state or federal courts located in the State of Delaware. Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

12.4     Assignment. This Agreement binds and benefits the parties and their respective successors and assignees. No party hereto shall have the right to freely assign any of its rights or delegate performance of any of its obligations under this Agreement, without the prior written consent of the other parties, except that Buyer may assign any of its rights and delegate performance of any of its obligations under this Agreement (a) to any Affiliate of Buyer, or (b) in connection with a business combination transaction, provided that no such assignment or delegation will relieve Buyer from any of its obligations hereunder.

13

12.5     Successors and Assigns. Subject to Section 12.4, all agreements made and entered into in connection with this Transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

12.6     Amendments; Waivers. No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

12.7     Entire Agreement. This Agreement (including the Exhibits which are hereby incorporated by reference into and made a part of this Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto, either verbal or written, and constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement.

12.8     Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement. Facsimile and/or PDF signatures shall be deemed original signatures.

12.9     Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any Person.

12.10     Section Headings; Interpretation. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement. As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to", and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

12.11     Third Parties. Nothing herein, expressed or implied, is intended to or shall confer on any Person other than the parties hereto any rights, remedies, obligations or Liabilities under or by reason of this Agreement.

12.12     Specific Performance. Buyer and Sellers agree that irreparable damage would occur and that the parties hereto would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity.

14

12.13    Exhibits. The Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein. Any capitalized terms used in any Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

12.14    Definitions. For purposes of this Agreement, the term:

(a)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(b)    "Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, or is controlled by, or is under common control with, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the powers to direct or cause the direction of management or policies of a Person, through the ownership of securities or partnership or other ownership interests, by contract or otherwise.

(c)    "Bidding Procedures" means those Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.

(d)    "Bidding Procedures Order" means the Order Granting Expedited Motion of Debtors for (i) Entry of an Order (a) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (b) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Remaining Assets, (c) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (d) Scheduling a Hearing to Approve Assumption and Assignment of the Assumed Contracts; (ii) Entry of an Order (a) Authorizing the Debtors' Entry into an Asset Purchase Agreement; and (b) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances; (iii) Entry of an Order Approving the Assumption and Assignment of the Assumed Contracts; and (iv) Related Relief, Docket No. 97 entered by the Bankruptcy Court on December 4, 2024.

(e)    "Business Day" means any day on which banks are not required or authorized to close in the City of New York, New York.

(f)    "Claim" has the meaning under section 101(5) of the Bankruptcy Code.

(g)    "Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

(h)    "Contract" means any agreement, contract, note, mortgage, bond, indenture, lease, benefit plan or other instrument whether written or oral.

(i)    ".

(j)    "Governmental Entity" means any supranational, national, state, provincial, municipal, local or foreign government or any instrumentality, subdivision, court, administrative agency or commission or other authority thereof.

(k)    "Intellectual Property" means all domestic and foreign, federal, state and/or provincial (i) patents and patent applications, and all patents issuing thereon, including without limitation utility, model, industrial design and design patents and certificates of invention, together with all reissue

15

patents, patents of addition, divisionals, provisional applications, renewals, continuations, continuations-in-part, substitutions, additions, extensions, confirmations, re-examinations, and all foreign counterparts of the forgoing which are in the process of being prepared, and all inventions and improvements disclosed therein (collectively, "Patents"); (ii) trademarks, service marks, trade dress, trade names, brand names, designs, logos, commercial symbols and corporate names, and all registrations, applications, and goodwill associated therewith (collectively, "Trademarks"); (iii) copyrights and all works of authorship, whether or not registered or copyrightable, and all applications, registrations, and renewals in connection therewith (collectively, "Copyrights"); (iv) software, including without limitation computer programs, operating systems, applications, software, firmware, tools, data files, databases, graphics, schematics, interfaces, architecture, file formats, routines, algorithms, and any and all specifications and documentation (including training and user manuals) related thereto and all copyrights therein ("Software"); (v) domain names, Internet addresses and other computer identifiers, web sites, URLs, web pages, unique phone numbers, registrations for any of the foregoing and any and all other similar rights and items ("Domain Names"); (vi) confidential and proprietary information, including without limitation, trade secrets, know-how, formulae, ideas, concepts, discoveries, innovations, improvements, results, reports, information and data, research, laboratory and programmer notebooks, methods, procedures, proprietary technology, operating and maintenance manuals, engineering and other drawings and sketches, customer lists, supplier lists, pricing information, cost information, business manufacturing and production, processes, techniques, designs, specifications, and blueprints (collectively, "Trade Secrets"); (vii) all other intellectual property and proprietary rights in any form or medium known or later devised; and (viii) all copies and tangible embodiments, goodwill, rights of priority and protection of interests therein, and rights to recover for past, present and future infringement associated with any of the foregoing.

(l)      "IRS" means the United States Internal Revenue Service.

(m)     "Knowledge of Sellers" means the actual knowledge of Jonathan Feldman, CRO, after due inquiry.

(n)      "Law" means any constitution, treaty, statute, law, principle of common law, ordinance, rule or regulation of any Governmental Entity.

(o)      "Lease" means all leases of real property or personal property.

(p)      "Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

(q)      "Liability" means any liability, debt, guarantee, claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

(r)      "Lien" means any mortgage, lien, claim, pledge, charge, security interest or encumbrance of any kind.

(s)      "Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of Sellers' business, as conducted by Sellers consistent with past custom and practice (including with respect to quantity and frequency) prior to the date of the commencement of the Bankruptcy Cases; provided, that in no event shall "Ordinary Course of Business" include any breach of Law or Contract, or violation of any Permit.

16

(t)    "<u>Outside Date</u>" means December 19, 2024.

(u)    "<u>Permit</u>" means any license, permit, franchise, approval, authorization, registration, certification, accreditation and consent of any Governmental Entity.

(v)    "<u>Permitted Liens</u>" means (i) Liens for utilities and current Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments that do not, individually or in the aggregate, adversely affect the operation of the business of Sellers, (iii) materialmans', mechanics', artisans', shippers', warehousemans', or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (iv) licenses granted on a non-exclusive basis, (v) such other Liens or title exceptions as Purchaser may approve in writing in its sole discretion or that do not, individually or in the aggregate, materially and adversely affect the operation of the business of Sellers, (vi) any Liens set forth on <u>Schedule 12.14(v)</u>, and (vii) any Liens that will be removed or released by operation of the Sale Order.

(w)    "<u>Person</u>" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a Governmental Entity.

(x)    "<u>Qualified Bid</u>" has the meaning set forth in the Bidding Procedures.

(y)    "<u>Sale Hearing</u>" has the meaning set forth in the Bidding Procedures.

(z)    "<u>Sale Motion</u>" means the motion filed with the Bankruptcy Court by Sellers in accordance with <u>Section 2.2</u> seeking (i) approval of the terms and conditions of the Transaction Documents, and (ii) authorization for (A) the sale of the Transferred Assets and pursuant to Section 363 of the Bankruptcy Code and (B) the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens.

(aa)    "<u>Sale Order</u>" means an order of the Bankruptcy Court (in a form acceptable to Buyer in its sole and absolute discretion), which shall, among other things, comply with <u>Section 2.3(a)</u>.

(bb)    "<u>Securities Act</u>" means the Securities Act of 1933, as amended.

(cc)    "<u>Sellers-Owned Intellectual Property</u>" means any and all Intellectual Property that is owned or purported to be owned by or proprietary to Sellers.

(dd)    <u>Subsidiary</u>" of any Person means any corporation or other form of legal entity an amount of the outstanding voting securities of which sufficient to elect at least a majority of its board of directors or other governing body (or, if there are not such voting securities, 50% or more of the equity interests of which) is owned or controlled, directly or indirectly, by such Person.

(ee)    "<u>Tax</u>" means (i) all federal, state, local, foreign or other taxes of any kind and any similar fees, assessments or charges (together with any and all interest, penalties and additions to tax imposed with respect thereto) imposed by any tax authority, including taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, severance, excise, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, unclaimed property, escheatment or net worth, and taxes or other charges in the nature of excise, withholding, ad valorem or value added; and (ii) any Liability for the payment of amounts described in clause (i) as a result of being a successor, a transferee or a member of an affiliated, consolidated,

17

combined or unitary group, or as a result of any obligation under any Tax sharing, indemnity or similar agreement or other Contract or arrangement.

(ff)    "Tax Return" means any return, declaration, report, estimate, claim for refund, or information return or statement or other document relating to, or required to be filed in connection with, any Taxes, including any schedule, form, attachment thereto or amendment thereof.

(gg)    "Transaction Documents" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by Sellers in accordance with the provisions of this Agreement.

[The next page is the signature page.]

**IN WITNESS WHEREOF**, the parties hereto have caused their respective authorized officers to duly execute this Asset Purchase Agreement as of the day and year first written above.

**G3 Business Services LLC**

By: _Gayathri Boyapalli (Dec 12, 2024 00:00 GMT+5.5)_

Name: Gayathri Boyapalli

Title: President

**SHIFTPIXY, INC., SHIFTPIXY STAFFING,INC. AND RETHINK HUMAN CAPITALMANGEMENT, INC.**

By: _____

Name: _____

Title: _____

## SCHEDULE 1.1

Schedule A

## Trademarks

## UNITED STATES – REGISTERED TRADEMARKS

| Mark | Image | Serial Number | Registration Date | Status |
|---|---|---|---|---|
|  | | 88479540 | 2020-01-14 | Live |
| SHIFTPIXY LABS | SHIFTPIXY LABS | 90159815 | 2022-12-27 | Live |
|  | | 88437998 | 2019-12-31 | Live |
| ZIPIXY | ZIPIXY | 88533774 | 2020-02-11 | Live |
| SHIFTPIXY | SHIFTPIXY | 86777367 | 2016-12-27 | Live |
| SHIFTPIXY | ShiftPixy | 86786929 | 2016-12-27 | Live |
| SHIFTPIXY LABS | ShiftPixy Labs | 88437998 |  | Dead |

Schedule B

## **Domains**

ShiftPixy.com

Seller can convey right, title and interest on an "as is, where is" basis to the following domain names, and is investigating the ability to transfer them to a buyer.

vitalhuman.capital

techstackery.com

technologyhuman.capital

shiftpixylabs.wordpress.com

eqngo7.wordpress.com

labs.shiftpixy.com

shiftablehr.wordpress.com

rethinkhcm.com

nativedelivery.wordpress.com

marketpixy.com

insurety.capital

industrialhuman.capital

agilehuman.capital

healthhuman.capital

firemark.global

firemarkglobal.com

fastpitchen.com

cluckinlucky.com

Schedule C

## **Patents**

| Jurisdiction | Patent No. | Title | Status | File Date |
|---|---|---|---|---|
| United States | US20180025309A1 | Shift Worker Platform | Abandoned | 2017-07-24 |

Schedule D

## **Social Media Accounts**

Seller can convey right, title and interest to these assets, yet does not currently have the ability to transfer them to a buyer.

| Platform | Username | Reach |
|---|---|---|
| Facebook | ShiftPixy | 6,700 Followers |
| Instagram | ShiftPixy | 560 Followers |
| LinkedIn | ShiftPixy | 2,000 Followers |
| Twitter | ShiftPixy | 17,800 Followers |
| YouTube | ShiftPixy | 796 Subscribers |
| TikTok | ShiftPixy | 34 Followers |

Schedule E

## **Software**

Source code for ShiftPixy's proprietary software platform and mobile application

Schedule F

**<u>Contracts with Vendors for Software Platform</u>**

Sendgrid
Twillio
MongoDB
AWS
GitLab
GitHub
HelloSign (Dropbox)
IBM Watson
OpenAI ChatGPT
Humanity
Microsoft - 365, AppCenter, Azure
Okta
Google Play Store
Apple Play Store
Egnyte
DreamHost
Wordpress
EasyDNS
Intacct (Accouting)
Prism
LastPass
Turn and/or Asurint

Schedule G

## Active Client List

Kose (Decorte)

Lions Floor

Seed School

Nilfisk

PoolCorp

Pactiv Evergreen

Little Caesars (Blue Line Distribution)

KW Property Management Co.

Bond No. 9

Century Trade Show Services, LLC.

Unbrako

Little Sister

Pasadena Baking Company

Schedule H

## **Public Shell**

Right, title, and interest to the $PIXY public shell.

# G3 APA - 121024 vE

Final Audit Report                                                2024-12-11

| | |
|---|---|
| Created: | 2024-12-11 |
| By: | Chris Todd (Chris@KaizenLawyer.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZGHrIYc_XB6_01eppR37qBNIXhrAuk-s |

## "G3 APA - 121024 vE" History

📄 Document created by Chris Todd (Chris@KaizenLawyer.com)
2024-12-11 - 5:19:05 PM GMT- IP address: 76.107.191.240

✉ Document emailed to Gayathri Boyapalli (gayathri@g3bllc.com) for signature
2024-12-11 - 5:19:11 PM GMT

📄 Email viewed by Gayathri Boyapalli (gayathri@g3bllc.com)
2024-12-11 - 6:18:46 PM GMT- IP address: 172.58.109.144

✒ Document e-signed by Gayathri Boyapalli (gayathri@g3bllc.com)
Signature Date: 2024-12-11 - 6:30:09 PM GMT - Time Source: server- IP address: 172.58.109.144

✅ Agreement completed.
2024-12-11 - 6:30:09 PM GMT

Powered by
Adobe
Acrobat Sign

# Exhibit "B"

**FIRST AMENDMENT TO
ASSET PURCHASE AGREEMENT**

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "First Amendment") is made as of December 16, 2024 (the "Effective Date"), by and between G3 Business Services LLC, a New Jersey limited liability company ("Buyer"), and Shiftpixy, Inc., Shiftpixy Staffing, Inc. and ReThink Human Capital Management, Inc. (each a "Seller" and, collectively, "Sellers").

**RECITALS**

WHEREAS, the parties entered into that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of December 10, 2024 [ECF No. 108], whereby Buyer agreed to purchase from Seller, and Seller agreed to sell to Buyer, the Transferred Assets;

WHEREAS, Seller notified Buyer on December 13, 2024 that one of the clients set forth on Schedule 1.1 sub-Schedule G of the Purchase Agreement, Bond No. 9, had submitted notice of termination of the Master Services Agreement with Sellers and therefore Sellers would not be able to transfer title to the client contract to Buyer on the anticipated Closing Date;

WHEREAS, the parties entered into good faith negotiations to address the material change and Buyer expressed its interest in moving forward with the Transaction for the same total Purchase Price but on modified terms; and

WHEREAS, Buyer and Sellers enter into this First Amendment to amend the terms of the purchase price set forth in the Purchase Agreement and sub-Schedule G.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. The Recitals above are true and correct and are incorporated herein by reference.

2. Terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

3. Section 4.1 of the Purchase Agreement shall be amended and restated as follows:

"4.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Consideration") to be paid by Buyer for the purchase of the Transferred Assets shall be:

1

(i)      the assumption of Assumed Liabilities,

(ii)      a cash payment equal to $850,000.00 (the "Cash Payment"),

(iii)      the payment of Cure Costs, and

(iv)      $1,000,000.00, payable in 12 quarterly installment payments (the "Installment Payments") of $83,333.33 with the first installment payment due on or before March 31, 2025, and the last payment due on or before December 31, 2027.

(b) At the Closing, Buyer shall deliver, or cause to be delivered to Sellers, the Cash Payment less the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made."

4.  Notwithstanding the provision for the payment of the Installment Payments, if Bond No. 9 (i) rescinds its termination of the Master Service Agreement, or (ii) enters into a new staffing agreement with the Buyer after the Closing, then in either case any unpaid Installment Payments shall be paid by the Buyer within 30 days of the occurrence of such event.

5.  Sub-Schedule G to Schedule 1.1 shall be deleted and replaced with Schedule G attached hereto.

6.  No other terms and conditions of the Purchase Agreement shall be modified by this First Amendment.

[Signature Pages Follow]

2

**IN WITNESS WHEREOF**, the Parties have caused this First Amendment to Asset Purchase Agreement to be duly executed on the date first written above.

**G3 Business Services LLC**

By: _____
Name: Gayathri Boyapalli
Title: Manager

**SHIFTPIXY, INC., SHIFTPIXY STAFFING,INC. AND RETHINK HUMAN CAPITALMANGEMENT, INC.**

By: _____
Name: Jonathan Feldman
Title: Chief Restructuring Officer

[First Amendment to Asset Purchase Agreement]

Schedule G

**<u>Active Client List</u>**

Kose (Decorte)

Lions Floor

Seed School

Nilfisk

PoolCorp

Pactiv Evergreen

Little Caesars (Blue Line Distribution)

KW Property Management Co.

Century Trade Show Services, LLC.

Unbrako

Little Sister

Pasadena Baking Company

[First Amendment to Asset Purchase Agreement]

Case 24-21209-LMI   Doc 470   Filed 03/19/26   Page 53 of 59

# Exhibit "C"



**From:** Ram Ajjarapu <ram@intlcap.net>
**Sent:** Wednesday, December 18, 2024 11:04 AM
**To:** Chris Todd <Chris@kaizenlawyer.com>
**Cc:** Isaac Marcushamer <isaac@dgimlaw.com>; feldman@katiephang.com
**Subject:** Re: Closing details

I agree to Isaac's suggestion that today onwards & going forward its our responsibility to assume all the bills that are assumed and required for our operations.

With best regards,

Ram Ajjarapu
Tel: (267)-888-1001

On Dec 18, 2024, at 9:25 AM, Chris Todd <Chris@kaizenlawyer.com> wrote:

Let me defer to Ram on the operational side of things – but your suggestion makes sense.

**Chris Todd**
CA Bar 211683
FL Bar 72911
TN Bar 40652
Former licensed CPA and
 CA Real Estate Broker

**www.KaizenLawPC.com**
**Phone:** (901) 587-0090 (Memphis)
**Phone:** (818) 452-4529 (Los Angeles)

**Email:** Chris@KaizenLawyer.com

Kaizen Law PC
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120

12605 Ventura Blvd., #1019
Studio City, CA 91604

<image001.jpg>
<image007.jpg>

**Confidentiality Statement: This e-mail transmission, including any attachments, contains information from Kaizen Law PC that is confidential and/or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please be aware that any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this electronic transmission in error, please notify us by telephone at (901) 587-0090 immediately.**

**From:** Isaac Marcushamer <isaac@dgimlaw.com>
**Sent:** Wednesday, December 18, 2024 9:23 AM
**To:** Chris Todd <Chris@kaizenlawyer.com>; Ram Ajjarapu <ram@intlcap.net>
**Cc:** Jonathan Feldman <feldman@katiephang.com> <feldman@katiephang.com>
**Subject:** Closing details

Chris:
How do you want to handle cut of and prorations for employees and the benefits. These things are billed on a monthly basis, I can have Richard prepare a report for us and we can work our way through it. I suspect the easiest thing to do is to prorate with everything from today forward being the buyer's responsibility. The buyer would then send in the difference to the debtor and the can pay them as they come due over the next 2 weeks or so.
Let me know.
Thanks

**Isaac M. Marcushamer**
Partner

<image008.jpg>

**D** (786) 698-6307 | **C** (305) 613-2975
**E** isaac@dgimlaw.com | **W** dgimlaw.com

2875 NE 191st Street, Ste 705
Aventura, FL 33180
<image009.png>

<image010.png>

<image011.png>

# Exhibit "D"

| In re:  SHIFTPIXY, INC., et. al. | | | |
|---|---|---|---|
| Case No.: 24-21209-LMI | | | |
| | | | |
| Summary of Inflows and Outflows for the Benefit of G3 Business Services, LLC | | | |
| From Accounts Held in the Name of ShiftPixy, Inc., ShiftPixy Staffing, Inc., and ReThink Human Capital Management, Inc. | | | |
| During the Post-Sale Period December 18, 2024 through April 1, 2025 | | | |
| | | | |
| *(Sorted by Net Amount in Ascending Order)* | | | |
| | | | |
| (Payee) / Payor | Net Amount | Inflows | Outflows |
| Laurice El Badry Rahme, Ltd dba Bond No. 9 [401 Bond No. 9] | $      (713,212.50) | $            - | $      (713,212.50) |
| Internal Revenue Service | (589,131.72) | - | (589,131.72) |
| National Payment Corporation (NatPay) - Shiftpixy Inc. (Corporate Payroll) - Client #12451348 | (194,179.37) | - | (194,179.37) |
| National Payment Corporation (NatPay) - ShiftPixy Staffing (Client Various) - Client #13356931 | (80,174.73) | - | (80,174.73) |
| UnitedHealthcare | (44,675.40) | - | (44,675.40) |
| PrismHR Inc | (31,614.85) | - | (31,614.85) |
| California Employment Development Department | (31,179.50) | - | (31,179.50) |
| Shiftpixy, Inc. (ACH PREP ORIGINTN) | (21,062.83) | - | (21,062.83) |
| Markoutsis Panayiotis | (13,245.14) | - | (13,245.14) |
| Sage Intacct | (12,887.00) | - | (12,887.00) |
| ADP | (8,485.14) | - | (8,485.14) |
| North Carolina Department of Revenue (NCDOR) | (7,602.00) | - | (7,602.00) |
| Maribel Candido | (6,391.41) | - | (6,391.41) |
| Julia Montano | (6,113.09) | - | (6,113.09) |
| Arturo Robles | (5,927.83) | - | (5,927.83) |
| Jose Rutilio Serrano Yanes | (5,442.03) | - | (5,442.03) |
| Bank Fees & Charges | (5,348.98) | - | (5,348.98) |
| Gonzalo Wieler | (5,299.07) | - | (5,299.07) |
| Amazon Web Services | (5,128.18) | - | (5,128.18) |
| Jose Guadalupe Torres Gloria | (5,098.49) | - | (5,098.49) |
| Martha M Navarro Cruz | (4,920.13) | - | (4,920.13) |
| Sandra Ramona Guerrero | (4,825.23) | - | (4,825.23) |
| Commissioner of Taxation and Finance | (4,616.07) | - | (4,616.07) |
| German Elias Menjivar | (4,601.51) | - | (4,601.51) |
| Alonso Vidal | (4,598.84) | - | (4,598.84) |
| Lucila Alvarado | (4,533.57) | - | (4,533.57) |
| Alida Magdalena Martinez | (4,372.07) | - | (4,372.07) |
| Marcela Ortiz | (4,343.97) | - | (4,343.97) |
| Juan Blas Martinez | (4,220.49) | - | (4,220.49) |
| Benjamin Beb Sam | (4,189.52) | - | (4,189.52) |
| Nancy A Garcia Vazquez | (4,125.36) | - | (4,125.36) |
| New Jersey Gross Income Tax (GIT) | (3,884.49) | - | (3,884.49) |
| Michelle Irigoyen | (3,801.19) | - | (3,801.19) |
| Jose Olivares | (3,771.20) | - | (3,771.20) |
| Jorge Rosales Vargas | (3,485.62) | - | (3,485.62) |
| Joseph Jesus Rincon Candido | (3,427.16) | - | (3,427.16) |
| Tana Arteaga | (3,396.75) | - | (3,396.75) |
| Fernando Hernandez | (3,354.47) | - | (3,354.47) |

Page 1 of 3

Based on Information
Received as of August 29, 2025

| | | | |
|---|---|---|---|
| *In re:*  SHIFTPIXY, INC., et. al. | | | |
| Case No.: 24-21209-LMI | | | |
| | | | |
| Summary of Inflows and Outflows for the Benefit of G3 Business Services, LLC | | | |
| From Accounts Held in the Name of ShiftPixy, Inc., ShiftPixy Staffing, Inc., and ReThink Human Capital Management, Inc. | | | |
| During the Post-Sale Period December 18, 2024 through April 1, 2025 | | | |
| | | | |
| *(Sorted by Net Amount in Ascending Order)* | | | |
| | | | |
| **(Payee) / Payor** | **Net Amount** | **Inflows** | **Outflows** |
| Ojeda Macedonio | (3,292.68) | - | (3,292.68) |
| Carlos Legorreta Guillen | (3,229.00) | - | (3,229.00) |
| Edwin Pec | (3,219.52) | - | (3,219.52) |
| Virginia Department of Taxation | (3,132.17) | - | (3,132.17) |
| Minnesota Department of Revenue | (3,087.70) | - | (3,087.70) |
| David Cos | (3,048.94) | - | (3,048.94) |
| Neida Analy Carrillo Xiloj | (3,034.32) | - | (3,034.32) |
| Israel Gasga Espina | (2,922.05) | - | (2,922.05) |
| Erick Argueta | (2,716.59) | - | (2,716.59) |
| Mario Mejia | (2,674.19) | - | (2,674.19) |
| Mari Gomez | (2,608.00) | - | (2,608.00) |
| Abraham J Ojeda | (2,386.99) | - | (2,386.99) |
| Alberto Santiago Lopez | (2,206.79) | - | (2,206.79) |
| State of Michigan | (1,922.55) | - | (1,922.55) |
| Illinois Department of Revenue (IDOR) | (1,904.48) | - | (1,904.48) |
| Juan Tambriz | (1,733.71) | - | (1,733.71) |
| Vanessa Martinez | (1,704.57) | - | (1,704.57) |
| Wisconsin Department of Revenue | (1,669.11) | - | (1,669.11) |
| Franchise Tax Board | (1,513.23) | - | (1,513.23) |
| National Payment Corporation (NatPay) - Fees | (1,414.85) | - | (1,414.85) |
| NYS Child Support Processing Center | (1,350.00) | - | (1,350.00) |
| Massachusetts Department of Revenue | (1,198.10) | - | (1,198.10) |
| Pennsylvania Department of Revenue | (1,034.78) | - | (1,034.78) |
| Georgia Department of Revenue | (956.45) | - | (956.45) |
| Yovani Perez | (911.36) | - | (911.36) |
| Abrahim James Issa | (899.02) | - | (899.02) |
| Arizona Department of Revenue | (744.09) | - | (744.09) |
| Ohio Treasurer of State | (712.78) | - | (712.78) |
| Texas State Disbursement Unit (SDU) | (596.30) | - | (596.30) |
| Illinois State Disbursement Unit | (579.96) | - | (579.96) |
| One Source Technology, LLC d/b/a Asurint | (535.85) | - | (535.85) |
| New Jersey Division of Taxation | (512.73) | - | (512.73) |
| Comptroller of Maryland | (465.31) | - | (465.31) |
| Regional Income Tax Agency (RITA) [OH] | (420.41) | - | (420.41) |
| Century Trade Show Services, LLC | (413.72) | - | (413.72) |
| City of Philadelphia | (279.61) | - | (279.61) |
| Kansas Department of Revenue | (275.71) | - | (275.71) |
| California State Disbursement Unit (SDU) | (252.00) | - | (252.00) |
| Louisville Metro Revenue Commission (LMRCE) | (212.66) | - | (212.66) |
| Commissioner of Revenue Services | (167.75) | - | (167.75) |
| Colorado Department of Revenue | (150.00) | - | (150.00) |

Based on Information

Page 2 of 3

Received as of August 29, 2025

| In re: SHIFTPIXY, INC., et. al. |
| :---: |
| Case No.: 24-21209-LMI |
| |
| Summary of Inflows and Outflows for the Benefit of G3 Business Services, LLC |
| From Accounts Held in the Name of ShiftPixy, Inc., ShiftPixy Staffing, Inc., and ReThink Human Capital Management, Inc. |
| During the Post-Sale Period December 18, 2024 through April 1, 2025 |
| |
| *(Sorted by Net Amount in Ascending Order)* |

| (Payee) / Payor | Net Amount | Inflows | Outflows |
| :--- | ---: | ---: | ---: |
| City of Birmingham Finance Department | (101.25) | - | (101.25) |
| Michigan Unemployment Insurance Agency (UIA) | (78.00) | - | (78.00) |
| City of Kansas City, Missouri | (74.92) | - | (74.92) |
| Nadia Torres | (72.10) | - | (72.10) |
| CT Paid Leave Authority | (68.13) | - | (68.13) |
| Alabama Department of Revenue | (67.68) | - | (67.68) |
| Columbus Income Tax Division | (17.53) | - | (17.53) |
| City of Aurora | (16.00) | - | (16.00) |
| City of Dayton | (15.78) | - | (15.78) |
| Arkansas Department of Finance and Administration | (12.25) | - | (12.25) |
| City of Moraine | (7.03) | - | (7.03) |
| Oklahoma Tax Commission | (4.00) | - | (4.00) |
| City of Pickerington | (3.60) | - | (3.60) |
| New Mexico Taxation and Revenue Department | (3.02) | - | (3.02) |
| Village of W Jefferson Tax | (1.73) | - | (1.73) |
| Utah State Tax Commission | (0.40) | - | (0.40) |
| Indiana Department of Revenue (DOR) | (0.40) | - | (0.40) |
| Unbrako USA - SPX | 2,472.52 | 2,472.52 | - |
| KOSE America,Inc | 2,531.64 | 2,531.64 | - |
| Nilfisk Inc. | 3,244.07 | 3,244.07 | - |
| Unbrako USA | 12,643.45 | 12,643.45 | - |
| Pactiv LLC | 13,039.66 | 13,039.66 | - |
| Fabri-Kal LLC | 18,110.44 | 18,110.44 | - |
| LSDT, LLC dba Little Sister | 104,683.38 | 104,683.38 | - |
| G3 Business Services LLC | 134,093.00 | 134,093.00 | - |
| Pasadena Baking Co Ltd | 199,580.30 | 199,580.30 | - |
| Shiftpixy Holdings Inc (Seacoast National Bank) | 250,396.08 | 250,396.08 | - |
| RA Capital Funding LLC | 275,000.00 | 275,000.00 | - |
| **Totals** $ | **(913,506.21)** $ | **1,015,794.54** $ | **(1,929,300.75)** |

Based on Information
Received as of August 29, 2025